Hung Ha
P. O. box 367
Berkeley, CA 94701-0367
USA
E-mail address:

1

2   Date: July 7, 2008

3   _____

**FILED**

4   UNITED STATES DISTRICT

JUL - 7 2008

5   IN AND FOR THE DISTRICT OF NORTHERN CALIFORNIA

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

6   _____

HUNG HA, et al,                          Case no: C07-04699 SI
7        Plaintiffs/Petitioners

                                          EXHIBITS IN SUPPORT OF MOTION
8       vs.                               TO SET ASIDE ORDER DENYING
                                          MOTION TO PROCEED AT PLAINTIFF'S
9   KENNETH MARK BURR, et al,             OWN EXPENSES (AND IN SUPPORT
        Defendants/respondents            OF PREVIOUS MOTION FOR RECONSIDER-
10                                        ATION SUBMITTED ON 2/19/08,
                                          docket # 15, REPLACING VOLUME OF
11   _____             SAME EXHIBITS)
    SUPERIOR COURT OF CALIFORNIA
    U.S. DEPARTMENT OF EDUCATION
12   BANK OF AMERICA
    U.S. DEPARTMENT OF JUSTICE.
13        Respondents

14   _____

15   I, Plaintiff in pro per, respectfully submit this volume of exhibits

16   in support of my motion for order setting aside order denying my motion
     to proceed at my own expenses (filed on June 6, 2008,
17
     and in support of my previously submitted (on Feb. 19, 2008) motion
18   for reconsideration (docket # 15), and I add an explanation about
     the need for resubmitting the same volume of exhibits.
19
         This volume of exhibits is the same as the one which I
20   had previously submitted to the Court, on Feb. 19, 2008 (Docket # 15)
     in support of my moiton for reconsideration, and/but it is re-produced
21   in an attempt to remedying the technical defects in the previously
     submitted volume of exhibits.  The following are the defects of the
22   previous volume of exhibits:
         1)  the page numbers of reporter's transcripts were skipped by
23   xeroxing equipment, so the numberous pages are without pagination;
         2)  the exhbiits in the previous volume are not paginated
24   consecutively from beginning to end, hence causing it difficult for
     the Judge and Staff to use the exhbits.
25
         In the replacement volume of exhbits, which I now respectfully submit,
26   I have done the following: (1) re-xerox reporter's transcripts to show
     pagination, (2) paginate all the exhibits from beginning to end, (3) revise
27   accordingly Index to exhibits, (4) replace the separate sheets of each
     exhibit or each group of exhbits, (5) show on Index of exhibits my
28   complaints  in Exh. 16.
     UNDER PENALTY OF PERJURY I declare that the foregoing is true and correct
     to the best of my ability, on this July 7, 2008 in Berkeley, Cal.

1  Declaration concerning admissibility of exhibits as evidence

2  I, the undersigned, state and declare under penalty of

3  perjury as follows.

4     I am the plaintiff to the above referenced action.  I am over

5  18 years of age, and I reside in Alameda County, California.  I am

6  competent to testify.  I have personal knowledge of the exhibits

7  and their content included in this volume of exhibits.

8     The exhibits are true and correct copies of court records (except

9  that I have written corrections of errors in reporter's transcripts

10 on the exhibits).

11    At the time, I am unable to produce the original or certified

12 copies of these court documents.  It costs a lot of money to

13 certify the court records, and whether there is a need for certified

14 copies is unclear to me at this time.  However, court records of

15 my civil cases (included in the exhibits) are accessible to

16 the public at the website of Alameda Superior Court of California

17 (www.co.alameda.ca.us/courts/domainweb).

18

19 UNDER PENALTY OF PERJURY I declare that the foregoing is true and
   correct, on this July 7, 2008, in Berkeley, California.

20 Hung Ha

21 Plaintiff in Pro Per
   P. O. box 367
22 Berkeley, CA 94701-0367
   E-mail address: seasprout9@yahoo.com
23

24

25

26

27

28

Index of Exhibits

1      complaint in P. v. Ha, 166802 (Alameda) (page 1)
2A     photo showing three police officers and me(seated on bench) (p 2)
2B     photo sowing Rhoden and Collan and me  (p 3)
2C     photo showing Rhoden and Collan (p 4)
2D     photo showing Collan's right hand (p 5)
3      reporter's transcript of proceeding on Dec. 20, 2001, mark Rhoden's
       testimony as a two minute event   (p 6 to p 46)
4      reporter's transcript off hearing on 12/21/01, containing Jason Collan's
       testimony about two minute event   (47 – 72)
5
6      reporter's transcript, Jan 2,2002, my testimony of the two minutes event (73-101)
7      Ross's conclusion of his first part of closing argument on Jan. 4,2002
       p.45: L.11-12        (102)
8      my closing argument, on same Jan. 4, 2002, p.48: L.4-12  (103)
9      Ross's closing argument, second part, p.71: L.24-25    (104)
10     jury returning verdicts on Jan. 2  (105-107)
11     three verdicts            (108 – 110)
12     sentencing proceeding on Jan. 9, 2002 (111 – 122)
13A    Rule 103(b) notice        (123)
13B    Order dated Oct. 30, 2006 (124)
13C    cover page of my opening brief submitted/filed on Nov. 2,2006 (125)
13D Order denying my request for relief from default and extension to file OB that
       was filed on Nov. 2; order was dated Nov. 6, 2006 (126)
13E    Order dismissing appeal, dated 11/17, filed on aa/20,2006, on face of
       document (127)
14     justice department's motion paper for vex. lit. orders (I omit its
       register of action pages)  (128-142)
15     my RJN #2 requesting judicial notice of same documents but to be
       interpreted in a different tenor  (143 – 145)
16     allegations of my complaints  (146-157)
17     reporter's transcript of Jan. 20,2005 hearing in Ha v. Ross, at which
       motion for vex. lit. orders was decided.  (158 – 171)
18     civil subpoena served on Judge Richman on Jan. 20, 2005 (172- 175)
19     declarative order, or order declaring me a vexatious litigant (176- 178)
20     prefiling order         (179)
21A    my voluntary dismissal without prejudice as to Winton Mckibben (180)
21B    " as to California       (181)
21C    " as to Thomas Reardon   (182)
22     second subpoena on Judge Richman (183 – 196)
23     subpoean on Malkai Begum (197 – 199)
24A to 24P   Orders issued by Justice McGuiness in CCP s.391.7 proceedings  (200-215)

Exhibit #16,allegations of my complaints, refers to the following cases:
        Ha v. Aranas, et al, 2002073289 (Alameda County, Cal.)(p.146 – p 149)
        Ha v. Rhoden, et al, 2002066008   (") (150 – 153)
        Ha v. Kochis, et al, 2002068743 (") (154 – 155)
        Ha v. Fry, et al, 2002073289 (") (156)
        Ha v. Berkeley Bowl Marketplace, et al, RG03122206 (") (157)

EXH. 1  Complaint, p 1

DAK  014  (1/78)

Dept No.  201
CUSTODY

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
## BERKELEY COURTHOUSE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA ) | No. 166802-1 |
| ) | |
| VS. ) | **COMPLAINT** |
| ) | |
| HUNG HA ) | PFN: BCB031    CEN: 1228257 |
| Defendant(s) ) | |

DAK  014  (1/78)

The Undersigned, being sworn, says, on information and belief, that said defendant(s) did, in the Berkeley-Albany Judicial District, County of Alameda, State of California, on or about **March 4, 2001**, commit a **MISDEMEANOR**, to wit:  a violation of Section **647(j)** of the Penal Code of California, in that said defendant did then and there wilfully and unlawfully lodge in a building, structure, vehicle, and place, located at **2ND FLOOR HALLWAY, DWINELLE HALL** without the permission of the owner and person entitled to the possession and in control thereof, **UC REGENTS**.

### SECOND COUNT

The Undersigned further deposes and says on information and belief, that said defendant did in the Berkeley-Albany Judicial District, County of Alameda, State of California, on or about **March 4, 2001** commit a **MISDEMEANOR**, to wit:  a violation of Section **243(b)** of the Penal Code of California, in that said defendant did then and there wilfully and unlawfully use force and violence without injury upon **OFFICER COLLOM**, a **peace officer** engaged in the performance of **his** duties and did know and reasonably should have known that the said OFFICER HALLWAY was a **peace officer** engaged in **his duties.**  COLLOM

### THIRD COUNT

The Undersigned further deposes and says on information and belief, that said defendant did in the Berkeley-Albany Judicial District, County of Alameda, State of California, on or about **March 4, 2001** commit a **MISDEMEANOR**, to wit:  a violation of Section **148(a)** of the Penal Code of California, in that said defendant did wilfully and unlawfully resist, delay, and obstruct a peace officer of the **BERKELEY POLICE DEPARTMENT**, in the discharge of and the attempt to discharge a duty of his office.  University of California

Pursuant to Penal Code Section 1054.5(b), the People are hereby informally requesting that defendant's counsel provide discovery to the People as required by Penal Section 1054.3.

Complainant therefore prays that a warrant issue and that said defendant(s) be dealt with according to law.

Subscribed and sworn to before me,    MAR 06 2001    E. TESAM ^r S-29

this  6th  day of  March    Names    01    UCPD/01-859

CLERK OF THE SUPERIOR COURT
ALAMEDA COUNTY
Deputy

Deputy District Attorney,
Alameda County, California.

JHA/55389/bt

Phone

000001

Exh. 1

exh. 2A    photo, p 2



2 A

exh 2B  photo  p 3

2 B

exh 2C photo    p 4



2 c

exh 2D   photo   p 5



2 D

exh. 3  rep  tr  p 6 - 46

COPY

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

BEFORE THE HONORABLE WINTON McKIBBEN, JUDGE

DEPARTMENT NO. 109

ENDORSED
FILED
ALAMEDA COUNTY
---oOo---

MAY 0 9 2002

CLERK OF THE SUPERIOR COURT

THE PEOPLE OF THE STATE OF                    No. 166802
CALIFORNIA,

        Plaintiff,

        Vs.

HUNG HA,

        Defendant.
_____/

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**JURY TRIAL**

WILEY W. MANUEL COURTHOUSE
OAKLAND, CALIFORNIA

THURSDAY, DECEMBER 20, 2001

APPEARANCES:

For the People:                    ANDREW ROSS
                                   Deputy District Attorney

For the Defendant:                 HUNG HA
                                   In Propria Persona

000197

1                              I N D E X

2

3                          W I T N E S S E S

4   FOR THE PEOPLE:                DIR    CRO    RED    REC    VD

5   OFFICER MARK RHODEN            17     74     143

6

7

8

9

10
    FOR THE DEFENDANT:
11
    -- None offered this day --
12

13

14

15

16
                          E X H I B I T S
17
    FOR THE PEOPLE:                      IDENT.      IN EVID.
18
    Exhibit 1                              23
19
    Exhibit 2                              34
20
    Exhibits 3-A - 3-G                     62          68
21
    Exhibits 4-A - 4-B                     66          68
22
    Exhibits 5-A - 5-B                     66
23

24
    FOR THE DEFENDANT:
25
    -- None offered this day --
26

27

28

                    DEANNA HILL, CSR #8765

1   building will then -- an officer will -- you know, has the

2   option of writing them a misdemeanor citation for lodging.

3   Q.    Now, is it the officer's discretion as to which of the

4   number of courses of actions can be taken in that environment?

5   A.    Yes, sir.  The officer can cite the person on the first

6   offense if that's what they -- if that's what they feel, if

7   they feel the offense is likely to continue or, you know, I'm

8   sure people have their personal reasons.

9   Q.    Now, this process of conducting these such security

10  checks, that's a process that is distributed out in your job

11  responsibilities?

12  A.    I'm sorry?

13  Q.    Security checks are part of your job responsibilities?

14  A.    Yes, sir.

15  Q.    And is that a uniform policy in your department?

16  A.    It is.

17  Q.    And that policy is enforced on a regular basis?

18  A.    It is.

19  Q.    Describe the conditions around 6:40 p.m. -- withdrawn.

20        Were you working on duty March 4th, 2001?

21  A.    Yes, sir.

22  Q.    What was your shift that day?

23  A.    Swing shift, which means I was working 2:00 p.m. to

24  midnight.

25  Q.    2:00 p.m. to midnight.

26        And where were you about 6:40 p.m. that night or in that

27  vicinity of time?

28  A.    I was at or in Dwinelle Hall.

```
 1   Q.   Could you describe the weather conditions that day?
 2   A.   Cold and rainy, wet.
 3   Q.   About 6:40 in the evening would you say it was light out
 4   or dark out?
 5   A.   It was overcast, so it was leaning more on the dark
 6   side, but it wasn't nighttime yet.
 7   Q.   Now, at some point you say you entered Dwinelle Hall?
 8   A.   Yes, sir.
 9   Q.   What day of the week was that?
10   A.   I believe it was a Sunday.
11   Q.   Dwinelle Hall, to your knowledge, does it generally
12   conduct classes on Sunday?
13   A.   No, sir.
14   Q.   To your knowledge, do any events occur at or within
15   Dwinelle Hall on the weekends?
16   A.   Yes, if they're scheduled in advance with the facilities
17   and building managers.
18   Q.   Where did you enter the building from?
19   A.   I entered the building through Dwinelle Plaza on the
20   east side of the building, what's considered the main
21   entrance.
22   Q.   Using a green marker pen to your side, if you could
23   please come to what I'd ask to be marked as People's
24   Exhibit No. 1, your Honor, for identification, a full campus
25   map of the University of California at Berkeley.
26            (Whereupon, People's Exhibit No. 1 was marked for
27            identification.)
28            MR. ROSS:  Q.  And if you could mark the general
```

10

1   vicinity of where you entered at Dwinelle Hall with an X1.

2   X1.

3   A.    Oh.    (Witness complies.)

4   Q.    Thank you.

5         Now, Officer, just offhand, do you know which, if any,

6   other entrances were open to Dwinelle Hall that day?

7   A.    I do not.

8   Q.    You entered through the main entrance?

9   A.    Yes, sir.

10  Q.    As you entered through the main entrance, describe what,

11  if anything, you observed.

12  A.    I observed about four to five students conducting like

13  what appeared to be practicing out like a skit or like a

14  dance-type thing.

15  Q.    When you had been in Dwinelle Hall, had you seen these

16  types of activities?

17  A.    Yes.

18  Q.    So seeing these activities, did that appear common to

19  you?

20  A.    Yes, it appeared very common.  The reason they practice

21  in that building is because that's usually the building that

22  they do the performances in.  So it lends itself to, you know,

23  practicing where you're going to perform.

24  Q.    And what about these individuals made you think they

25  were students?

26  A.    Well, the fact that they were college age, between 18

27  and 24, and I would say at least two to three of them were

28  wearing Cal or Berkeley sweatshirts and they had, you know,

1    books and actual like boards like this that they had plans on

2    for their skit, what have you.

3    Q.    And the routine that was being practiced, that looked

4    similar to routines you had seen in the past there?

5    A.    Yeah.    Actually, I would say even earlier that week I

6    had seen similar practices taking place.    Whether or not it

7    was the exact same group, I do not know.

8    Q.    What did you do after you entered the first floor of the

9    building?

10    A.    I turned south to the main lobby of the building and

11    went to the -- went to the end of the building and I turned

12    west and went to the southwest stairs and went up to the

13    second floor.

14    Q.    Now, as you walked through the first floor of the

15    building, would you describe what activity, if any, other than

16    the routine you had earlier observed, that you saw?

17    A.    Zero.    Nothing.

18    Q.    And did you observe whether any classes were in session?

19    A.    There were no classes in session that I saw.

20    Q.    Was the building fully lighted or were parts of it dark?

21    A.    The first floor, from what I recall, all the lights were

22    on.    And then typically as you go up, sometimes, you know,

23    they turn off like every other light.    I guess there's a

24    switch that turns off half the lights to save power.

25    Q.    So the building didn't look to you to be in full

26    operation on that Sunday?

27    A.    No, sir.

28    Q.    Did you proceed to conduct a check of the first floor as

12

1    you progressed through it?

2    A.    I checked the portion that I walked through.  Usually

3    what I do is I will walk through, make my way up the building,

4    head to the other side of the building and make my way down,

5    kind of like a circle.

6    Q.    And that's commonplace for you during these security

7    checks?

8    A.    For me it is.

9    Q.    Did you reach the second floor?

10   A.    I did.

11   Q.    When you arrived at the second floor, did you see

12   anybody on the second floor?

13   A.    I did.  When I stepped out of the stairwell, I looked to

14   my right, which would be east, down the hallway and I saw an

15   Asian male standing eating out of a plastic bowl.  Appeared to

16   be like a ball of dough.

17   Q.    Now, were there any lights on on the second floor?

18   A.    Yes.

19   Q.    Would you go back to the exhibit and mark with an X-2

20   the location where you saw the man eating out of the bowl?

21   A.    Do you want me to use the same pen?

22   Q.    You can use the same pen.

23   A.    (Witness complies.)

24   Q.    Thank you.

25        Now, the portion of the building that you've just

26   marked, that looks to be an end corridor, a corner of --

27   A.    Yes, sir.

28   Q.    Could you describe that area?

13

```
 1    A.    Well, it -- the north wall has a -- the north wall of
 2    that corner has a bench with a window over it with a -- with
 3    probably about a foot and a half deep window sill -- ten
 4    inches to a foot and a half window sill.  And then there is
 5    a -- in the corner, which would be from the north wall and the
 6    east wall, there is a -- it's a big pipe.  I believe it's a --
 7    used for fire.  And on the south wall, near the east wall,
 8    there is another set of stairs.  And also on the east wall
 9    there's Room 203, the door to Room 203.
10    Q.    So the end of the corridor where you saw the man eating
11    the food, there was an exit location near that spot?
12    A.    There was.
13    Q.    And where did that exit go to?
14    A.    It went down to the ground level and also up to further
15    floors.
16    Q.    The person that you saw eating the food, do you see that
17    person here in court today?
18    A.    I do.
19    Q.    Could you please identify him by where he's sitting and
20    an approximate clothing description?
21    A.    He's sitting right here in front of me in the white
22    collared shirt holding a white pen.
23          MR. ROSS:  Your Honor, may the record reflect the
24    witness has identified Mr. Ha?
25          THE COURT:  It will.
26          MR. ROSS:  Q.  Now, when you first observed Mr. Ha,
27    could you estimate the distance from you to Mr. Ha?
28    A.    I would say it was at least 60 to 70 yards.  It's a
```

 1  pretty long hallway.

 2  Q.   So that would be much longer than this courtroom then,

 3  right?

 4  A.   I would say at least two and a half to three times the

 5  length of this courtroom.

 6  Q.   Thank you.

 7       When you first observed Mr. Ha, describe how you were

 8  dressed.

 9  A.   I was dressed in a full police uniform with a raincoat

10  on with --

11  Q.   And what's the full police uniform consists of?

12  A.   It consists of black boots, L.A.P.D. blue wool trousers

13  and shirt, and I was wearing a black and fluorescent green

14  raincoat with my metal badge attached to the outside of the

15  raincoat and it says "Police" in orange on the rear of the

16  raincoat.

17  Q.   Were you wearing any type of head covering?

18  A.   Yes, sir.   I was wearing a standard issue University of

19  California police baseball cap.

20  Q.   And that has a marked insignia?

21  A.   Yes, sir.   It's "Police" in gold and "University of

22  California," I believe, is written under it in script in

23  white.

24  Q.   Where was the defendant in relation to Room 203 when you

25  first saw him?

26  A.   Either right in front of the door or a couple of feet in

27  either direction in front of the door.

28  Q.   After you first saw the defendant, did you observe

1  whether or not he looked in your direction at all?

2  A.    I saw him look directly at me and then he turned away,

3  walked into a couple of -- walked in a couple circles and sat

4  down on the bench in the alcove.  Well, in the recess in the

5  wall.

6  Q.    That was in the same area where he was already walking

7  in circles?

8  A.    Yes, sir.

9  Q.    So the bench in the alcove, would that be directly

10  across from that exit at the end of the corridor you

11  mentioned?

12  A.    Yes, directly across from Room 203.

13  Q.    So then looking out from the bench to the exit, would

14  there be a wall to Mr. Ha's left?

15  A.    Sitting on the bench looking at the exit would there be

16  a wall on his left?  Correct, there would be a wall on his

17  left.

18  Q.    And what did you do after you first saw the defendant?

19  A.    Nothing.  I looked at him, he looked at me, I continued

20  to walk down the hall and I was checking doors to make sure

21  they were secure, and the rooms that weren't secure, which

22  would be typically empty classrooms, I looked inside to make

23  sure nobody was in there sleeping or doing anything they're

24  not supposed to.

25  Q.    And did you notice any other activity on the second

26  floor other than Mr. Ha's presence?

27  A.    I did not.

28  Q.    What did you do next?

16

1    A.    After I made my way to him or -- I continued -- I
2    proceeded east down the hallway and pretty much checked every
3    door.  And when I got to the end hallway I spoke with the
4    defendant and I asked him, you know -- I saw a bunch of stuff
5    spread out on this bench and I asked him if it was his and he
6    said it was.

7    Q.    Now, when you approached the defendant, could you tell
8    if he was looking in your direction at all?

9    A.    Actually, he kept looking at me and then looking away.
10    He would like look over in my direction and then keep looking
11    away, which I thought was kind of strange.

12    Q.    Did you have any concern about Mr. Ha at that point
13    before you approached him?

14    A.    Well, before I approached him, no, because I could not
15    see what was there on the bench from my vantage point when I
16    was walking down the hallway.  But when I actually made it up
17    to him and I saw that there was a lot of his -- well, at the
18    time, up until he admitted they were his belongings, I was
19    assuming they were his belongings, and that kind of struck me
20    as odd that they were all sprawled out.

21    Q.    Now, when you first reached Mr. Ha's location, do you
22    recall if he had any shoes on or not?

23    A.    I do recall that he did not have his shoes on and they
24    were placed underneath the bench.

25    Q.    Describe all the property -- the items of property that
26    you observed in the vicinity of the defendant.

27    A.    I -- on the bench there were a couple of plastic
28    grocery-type bags, some of them with food, some of them with

DEANNA HILL, CSR #8765

1    cloth, which could have been clothes.  There was a light thin
2    tarp.  There was a -- like a rain poncho-type thing that
3    matched some rain pants that he had on.  There was a white
4    alarm clock.  There was a couple of satchels, bags, and, like
5    I said, his shoes underneath the bench.  And other than that,
6    I don't recall exactly what was there.
7    Q.    So there were numerous items of property?
8    A.    Yes, sir.
9    Q.    And did they look to be spread out to you?
10   A.    Yes, sir.  Oh, and there was a couple of notebooks.
11   Q.    Where was the alarm clock?
12   A.    The alarm clock was on the wood bench, probably about
13   three to -- two to four feet from the east end of the bench.
14   Q.    And where was the tarp-looking item that you mentioned?
15   A.    It was folded in either thirds or quarters and laid on
16   the bench.  Almost like a blanket or like a pad-type thing.
17   Q.    And where was the rain poncho cover?
18   A.    It was between the tarp and the grocery-type bags I had
19   mentioned.  It was kind of scrunched up.  It appeared to me
20   like something to rest your head on.  The whole scene appeared
21   like a makeshift bed.
22   Q.    Now, you've encountered persons lodging in buildings
23   before, right?
24   A.    Yes, sir.
25   Q.    In your career as a police officer, approximately how
26   many people would you say you've encountered that were lodging
27   at any of the U.C. Berkeley buildings?
28   A.    Up to that point or up to now?

18

1  Q.  Up to that point.

2  A.  Up to that point, at least 30 -- 20, 30.  I mean -- and

3  that's probably going on the low end.

4  Q.  Now, the scene that you observed as you arrived at the

5  defendant's location, was that consistent with lodging?

6  A.  Yes.  It was probably above and beyond what I've seen in

7  prior instances of lodging.  It was -- it appeared to be the

8  extreme.

9  Q.  So did you -- did it basically look like he'd set up

10  camp there?

11  A.  Yes, it did.

12  Q.  Now, let me ask you, Officer, had you ever seen the

13  defendant prior to this contact?

14  A.  I do not believe so.

15  Q.  And when you initially contacted the defendant, did he

16  say or do anything to give you the impression that he wasn't

17  lodging?

18  A.  No.  He -- other than telling me that the stuff belonged

19  to him, he refused to say anything to me other than, "I don't

20  have to talk to you."

21  Q.  What happened when you first -- we'll backtrack a

22  little.

23      What exactly did you first ask the defendant or say to

24  the defendant as you arrived at your location?

25  A.  Well, without looking at my report, I would say that I

26  asked him if the stuff on the bench and in the area belonged

27  to him, and he stated that they did.

28  Q.  Did you at any point make any broadcasts or at that

DEANNA HILL, CSR #8765

19

1   point make any broadcasts?

2   A.    Yes.    When I initially talked to him, I put out that I

3   was -- a police code, which is 1194, which means you're on a

4   pedestrian stop.    And I put out my location as being the --

5   near the southeast corner of the second floor of Dwinelle

6   Hall.

7   Q.    At that time did you request any cover or backup?

8   A.    I didn't, but a cover unit was assigned to me because I

9   didn't say I was Code 4 at the time, which means -- when you

10  state that you're Code 4, it means you do not need any

11  assistance.    And I put out my stop of 1194 on one person in

12  that location and then I ended my transmission.    And our

13  dispatchers are trained to -- if you don't put out Code 4, you

14  assume that they will take a cover unit.    So a cover unit was

15  assigned to me, but then I cancelled the cover unit because at

16  the time I didn't think I needed a cover unit.

17  Q.    How soon after the initial cover was provided did you

18  cancel that cover?

19  A.    Oh, five seconds.

20  Q.    Thank you.

21          THE COURT:    I'm going to interrupt here so we can

22  take a morning recess, please.

23          Ladies and gentlemen, we'll take a recess until

24  11:00 o'clock.    Please keep in mind the fact that you are not

25  to discuss the case amongst yourselves or with anyone else.

26  And if anyone attempts to discuss the case with you in any

27  way, please advise the Court of that fact immediately.    You

28  may leave your note pads and your personal items on your

```
 1    chairs.   Return at 11:00 o'clock, please.
 2                (Recess taken.)
 3                (Whereupon, People's Exhibit No. 2 was marked for
 4                identification.)
 5                THE COURT:   All the jurors, Mr. Ross and Mr. Ha are
 6    all present and the witness, so we may resume, please.
 7                MR. ROSS:   Thank you, your Honor.
 8    Q.    Officer Rhoden, the map that I've shown you here of the
 9    Berkeley campus, is that a complete map?
10    A.    No, it is not.
11    Q.    And what does this map represent?
12    A.    More or less it represents the west half of the main
13    campus proper from about the middle.
14    Q.    Thanks.
15          Looking at this larger map of Dwinelle Hall, could you
16    come and mark with a green pen an X1 where you made contact
17    with Mr. Ha?
18    A.    (Witness complies.)
19                THE COURT:   Mr. Ross, will you stand so that Mr. Ha
20    can see also, please?
21                MR. ROSS:   Q.   And that's the same corner of the
22    building that you spoke about on the other side of the map --
23    A.    Yes.
24    Q.    -- the first map?
25          When you first made contact with defendant, did you tell
26    him he was under arrest?
27    A.    No, I did not.
28    Q.    Did you tell him he was detained?
```

1  A.    When I first spoke to him I did not.

2  Q.    Did you have any weapons drawn?

3  A.    No, sir.

4  Q.    Were you carrying any weapons at all?

5  A.    Yes, sir.

6  Q.    What were you carrying?

7  A.    I was carrying my standard issue Sig Sauer .40 caliber

8  pistol, an asp, a collapsible baton, and a canister of O.C.

9  spray.

10 Q.    What's O.C. spray?

11 A.    Pepper spray.  Orselo (phonetic) capsicum.

12 Q.    When you made contact with defendant, you didn't have

13 any of those out?

14 A.    Actually, my gun was out.  It was not out in my hand,

15 but, I mean, it was -- there's a cutout in my raincoat so you

16 can -- so your gun actually sticks out so you can get to it if

17 you need it.

18 Q.    What was your goal when you made contact with defendant?

19 A.    My goal was to find out if he had a right to be there.

20 And if he had a right to be there, then so be it.  I would

21 have went on my merry way.  And if he didn't have a right to

22 be there, then I would have asked him to leave.

23 Q.    What happened when -- strike that.

24        Did you ask the defendant his name after he indicated

25 the property was his?

26 A.    I believe so, but to be exact I would need to look in my

27 report.

28 Q.    Would it help you to refresh your recollection to refer

22

1   to that portion of your report?

2   A.   It would.

3   Q.   Could you please look at that portion of your report,

4   read that passage, and when your memory is refreshed, if at

5   all, please look up.

6       Did you ask him his name or any other questions?

7   A.   I did.   I asked him his name and I asked him if he was a

8   U.C. student, and he replied that he didn't have to answer

9   that.

10  Q.   So defendant told you he didn't have to answer?

11  A.   Correct.

12  Q.   Describe his demeanor when he said that to you.

13  A.   His voice was stern.   I would say though he was seated,

14  he was rigid and he pointed at me when he said that.

15  Q.   What tone of voice were you using when you asked these

16  questions?

17  A.   I would say pretty calm, almost jovial at first, you

18  know.   I tend to be pretty cordial with people when I'm just

19  talking to them.   He hasn't done anything to me.   I haven't

20  done anything to him.

21  Q.   About how far from the defendant were you standing at

22  this point?

23  A.   Three and a half to five feet away.   At least --

24  probably at least two arm lengths.

25  Q.   Now, after the defendant told you that he didn't have to

26  answer your question about his identity or whether he was a

27  student, was there ever any discussion about your gun?

28  A.   Yes.   He said that I was trying to intimidate him with

23

```
 1   my gun.  And I asked him what he meant and he didn't say, so I
 2   pulled my raincoat -- I broke the velcro strap on the bottom
 3   of my raincoat, covered my gun, and I said, "Well, now my gun
 4   is covered.  You don't need to worry about that."
 5   Q.    When did that occur?
 6   A.    After he said "I don't have to answer" -- after he told
 7   me that he did not have to answer my question in regards to
 8   his identity and his affiliation with the university.
 9   Q.    Why did you cover your gun?
10   A.    I mean, if it was making him nervous, you know, why not
11   not make him nervous and go ahead and get the questions
12   answered and both of us get -- you know, go on with our lives.
13   Q.    Could you describe the defendant's demeanor when he
14   talked to you about your gun?
15   A.    He was stern in his tone and pointing at me and the gun
16   and he appeared to be threatened by it.
17   Q.    What's the very next thing that happened after you put
18   the gun away?
19   A.    I told him that based on what I had seen there on the
20   bench and the -- you know, with the alarm clock and the tarp
21   and the bags of belongings, I told him that at this point I'm
22   detaining him for investigation of trespassing and lodging and
23   that he did indeed need to identify himself to me.
24   Q.    What, if anything, did defendant say to you at that
25   point?
26   A.    I would need to look at my report.  I believe I have a
27   pretty detailed description of what he told me.
28   Q.    Would it help you to refresh your recollection by
```

1    looking at that portion of your report?

2    A.    Yes, sir, it would.

3    Q.    Could you please look at that portion, read that

4    passage, and if you're memory is refreshed, please look up.

5         What happened, if anything, after you told the defendant

6    you were detaining him and that he needed to provide you with

7    I.D. or verification of his student status?

8    A.    I asked him again what his name was, and he didn't say

9    anything.  And then -- no, correction.  I asked him what his

10   name was, and he said, "You're violating my constitutional

11   right of search and seizure."  And I informed him that I was

12   neither searching him nor seizing anything from him.

13        And I -- at that point I realized that talking to -- you

14   know, talking to him was just going to turn into a big

15   argument, so I radioed for the officer who had already been

16   assigned to cover me, you know, a couple of seconds before

17   that -- because this whole conversation probably, you know,

18   was maybe 30 seconds to a minute.  He was pretty agitated.

19   And when someone's that agitated, it's probably good to have

20   another officer there, if nothing else, as a witness.

21        So since an officer had already been called to come and

22   I cancelled him, I figured I would go ahead and call that

23   officer -- that specific officer back since he was called off

24   of what he was doing to begin with.

25   Q.    Now, at the point where the defendant told you that you

26   were violating his constitutional rights of search and

27   seizure, did he raise his voice at all to say that?

28   A.    I would say he was yelling at me.

1   Q.    And at this point you had asked him three or four times

2   to identify himself?

3   A.    I believe three times.

4   Q.    And had you actually told him that he could stay if he

5   was able to identify himself or show proof he was a student?

6   A.    I did.

7   Q.    So at that point you requested the cover, right?

8   A.    Yes, sir.

9   Q.    What's the code for that?

10  A.    It would be 1198.  They -- originally they assigned

11  Officer 45 as my cover unit.  I said 1022 cover, which is

12  cancel it.  I don't -- you know, I don't recall if that's the

13  exact words I used.  And then when I called for the cover

14  unit, I said 45 from 91.  That's me.  You know, either why

15  don't you go ahead and come over here or 98 at my location.  I

16  don't remember the exact words I used.

17  Q.    And 98, again, means --

18  A.    98 means to meet.  1198 means to meet at.

19  Q.    Now, if you felt threatened by the defendant at this

20  point or if the situation indicated possible threats, would

21  you use a different request for cover?

22  A.    Like if it was an emergency?

23  Q.    Yes.

24  A.    Code 3.  You could use Code 3.  And then, actually, if

25  you were in grave danger, like being shot at or something, you

26  could say 1199, which means emergency, and pretty much every

27  agency around is going to be flying to your location.  But

28  that's in extreme emergencies.  Normally, like if somebody --

```
 1   if there's an altercation or something and you need emergency
 2   cover, you normally say Code 3 cover or you would put out that
 3   you were fighting.
 4   Q.    So at this point then who did you ask for the cover to
 5   make more comfortable?
 6   A.    I'm sorry?
 7   Q.    Who were you trying to make more comfortable when you
 8   asked for cover?
 9   A.    I was trying to make the defendant more comfortable
10   because I figured he didn't want to talk to me.  You know,
11   maybe he would rather talk to somebody else, because it
12   already seemed like he was put off by me with the whole gun
13   thing, you know.  He seemed pretty intimidated.  So I was just
14   trying to put him at ease and hurry up the process, you know.
15   You know, hurry up the process.  Either he could be there or
16   he couldn't.
17   Q.    After you requested cover, what next did you tell the
18   defendant?
19   A.    I do not believe I said anything to him specifically.  I
20   remember him talking to me, saying like "You can't do this"
21   and, you know, "You're violating my rights."
22   Q.    Did you indicate to him whether or not he was in
23   violation of any other code sections?
24   A.    Yes.  I indicated that by not answering my questions and
25   identifying himself, he was in violation of California Penal
26   Code Section 148(a)(1), and I specifically told him the
27   section, you know, so he wouldn't, you know, think I'm just
28   making something up.  He was delaying a peace officer.
```

DEANNA HILL, CSR #8765

27

1  Q.    At this point had you closed the distance between you

2  and the defendant?

3  A.    No.  I would actually say I made that distance larger.

4  Q.    And Mr. Ha was still on the bench?

5  A.    Yes, sir.  He was seated on the bench.

6  Q.    When you told Mr. Ha that he was obstructing or

7  resisting your investigation or delaying you in violation of

8  148 of the Penal Code, did he respond to that at all?

9  A.    If I remember correctly, he told me that he -- actually,

10  I need to look at my report.  I believe he told me he was

11  going to arrest me for something.  I don't recall exactly what

12  he said.

13  Q.    Now, would it help you to look at that portion of your

14  report to refresh your recollection?

15  A.    Yes, sir, it would.

16  Q.    Would you please look at that portion of your report,

17  read that passage?  If your memory is refreshed, please look

18  up.

19  A.    The defendant told me that, "I want a witness because

20  I'm arresting you," pointing at me, "for violating my

21  constitutional rights."  I informed him that another officer

22  was en route.

23  Q.    Was the defendant speaking to you in a calm manner?

24  A.    Definitely not.

25  Q.    Was he raising his voice to you at this point?

26  A.    Yes.  He was shouting at me and pointing at me.

27  Q.    What happened next?

28  A.    I stood there quietly.  He kept going on about me

 1  violating his constitutional rights.  And then Officer Collom,

 2  No. 45, arrived at the scene.

 3  Q.    By the time Officer Collom arrived, did defendant look

 4  to be in a highly agitated state?

 5  A.    Yes.

 6  Q.    Did you continue to try to ascertain defendant's

 7  identity at the point of which Officer Collom arrived?

 8  A.    Actually, after I called for the cover unit and told him

 9  that I -- after he told me that he wanted a witness, I didn't

10  say anything to him.  I believe the next person to speak with

11  him after that was Officer Collom.

12  Q.    And did Officer Collom continue to ask the defendant for

13  his identification or his name?

14  A.    Yes, sir.

15  Q.    Did the defendant respond?

16  A.    No, sir.  He told him that he was not going to tell him

17  his name.  And Officer Collom asked him if -- you know, to

18  make it easier, if he could call him John, and he agreed.

19  Rather than saying, well, "Hey you," you know, give him some

20  name.

21  Q.    Is this after defendant refused to give a name?

22  A.    Yes.

23  Q.    Now, at some point did defendant make any effort to

24  cause you to leave?

25  A.    I don't understand what you mean by that.  Like asked us

26  to leave or tell us to forget about it?

27  Q.    Anything like that?

28  A.    Yeah, he said that we should just forget about it and

29

1  leave him alone.  He said that we weren't bothering the
2  students on the first floor and that we should just leave him
3  alone.
4  Q.    And how would you describe his tone of voice?
5  A.    Agitated and argumentative.  He was, like, ordering us.
6  Q.    How many times, up to this point, would you estimate you
7  or Officer Collom had requested unsuccessfully defendant's
8  name or any identification?
9  A.    Well, including the three or four times I asked him and
10  I believe Officer Collom asked him another two to three times,
11  so that puts us around five to seven times.
12  Q.    Over what period of time would you say had passed at
13  this point?
14  A.    From the beginning of the initial stop to the last time
15  Officer Collom asked him?
16  Q.    Yes.
17  A.    Five minutes maybe.  I know it's noted.  The times --
18  the exact times on the stop and when certain people arrived
19  and when I called for cover and stuff is -- it's on the
20  computer aided dispatching printout that's attached to the
21  report.
22  Q.    Thank you.
23        At this point, what, if anything, did you decide to do?
24  A.    Me personally --
25  Q.    Yes.
26  A.    -- or after -- after Collom asked him for his
27  identification?
28  Q.    We're at the point now where Mr. Collom --

1  Officer Collom is calling the defendant by whatever name.

2  A.   Oh, okay.  He still refused to say why he was there,

3  what he was doing, and he kept telling us that we had no right

4  to be doing what we were doing to him.  So we informed him

5  that we were going to arrest him for 148(a)(1) of the

6  California Penal Code.

7  Q.   And did you arrest him for anything else, do you

8  remember, at that point?

9  A.   No, I was not.  No, that's not true.  I'm sorry.  I

10 misspoke.  We were arresting him for the trespassing and the

11 148.

12 Q.   Now, at the time you decided to arrest Mr. Ha, were

13 you -- did you notice whether or not he still had his shoes

14 off?

15 A.   At that point I really can't remember if he had his

16 shoes off.  If I remember correctly, while I was waiting for

17 Officer Collom to come to the scene Mr. Ha put on his shoes.

18 Q.   After you informed Mr. Ha that you were going to arrest

19 him, did you make an attempt to arrest him?

20 A.   Yes.

21 Q.   Did Officer Collom assist you?

22 A.   Yes.

23 Q.   How did you attempt to arrest Mr. Ha?

24 A.   Him facing me, I walked to his right side and

25 Officer Collom walked to his left side.  And he was -- at that

26 point it appeared as Mr. Ha was going to be compliant and he

27 kind of was half sitting up off the bench.  And I took his

28 right arm and placed him in a rear wristlock, and

1  Officer Collom went to grab his left arm in an attempt to put

2  him in a rear wristlock, and that is when he stood up and

3  started to struggle with Officer Collom.

4  Q.    Now, backing up just a little bit, when you went to try

5  to do the right arm wristlock --

6  A.    Uh-huh.

7  Q.    -- what portion of defendant's body were you standing

8  by?

9  A.    I was standing on his right side, because he was still

10 like halfway seated on the bench like this.  It appeared as if

11 he was going to comply with us and stand up.

12 Q.    He was facing away from the wall towards the --

13 A.    He was facing more or less Room 203, which was across

14 the hall from the bench.

15 Q.    Using the blue pen, can you draw that setting?

16 A.    (Witness complies.)

17 Q.    Now, is this corridor heading left out to the page of

18 the diagram?

19 A.    This corridor continues this way to the west end of the

20 building on the second floor, and there's another corridor

21 that goes north and south this way, and there's another actual

22 stairwell here, stairs here, the door to No. 203 here, stairs

23 here, the bench, the window, the defendant here, I was

24 standing here and Officer Collom was standing here.

25          MR. ROSS:  Let the record reflect, your Honor, that

26 all the "heres" that Officer Rhoden is indicating are marked

27 locations on the drawing that he's just drawn.

28          THE COURT:  All right.

```
 1          MR. ROSS:  Q.  Okay.  So what happened when you
 2   first attempted to handcuff the defendant?
 3   A.   Well, at that point we weren't even trying to put him in
 4   cuffs yet.  We were just going to stand him up and turn him
 5   around so we could put him in cuffs.  We hadn't even gotten to
 6   the point where we even had the handcuffs out.
 7   Q.   Now, at this point had either you or Officer Collom at
 8   any time produced any weapons, such as a pistol, the club or
 9   flashlight or pepper spray?
10   A.   No.  Other than them being mounted on our belts, no.
11   Q.   What happened after Mr. Ha stood up?
12   A.   He stood up and I had a pretty firm grip on him, and
13   using me as a base, he started to struggle with
14   Officer Collom.  He started -- oh, actually, this hand.  He
15   started to swing around his left arm, not allowing
16   Officer Collom to take his wrist and his elbow and put his arm
17   behind his back, and he --
18   Q.   We'll go one piece at a time.
19   A.   Okay.
20          MR. ROSS:  Your Honor, just for the record, let the
21   record indicate that when Officer Rhoden talked about
22   defendant trying to move about his left arm, Officer Rhoden
23   was demonstrating with his own left arm in a swinging forward
24   to backwards motion.
25          THE COURT:  If that's what happened.
26          THE WITNESS:  Yes, your Honor, that's...
27          MR. ROSS:  Q.  Did you have a pretty good hold of
28   the right arm of Mr. Ha?
```

DEANNA HILL, CSR #8765

1  A.    Yes, I had a firm grip of his right wrist and his right
2  elbow.
3  Q.    And were you to the side of him, in front of him or
4  behind him at this point?
5  A.    I was still on his right side.  Even as he turned, I
6  maintained my position in reference to his body.
7  Q.    And what part of his body was the front of your body
8  facing?
9  A.    What part of his -- I was facing his right side.  So the
10  front of my stomach or chest area was at his right side, his
11  elbow.
12  Q.    As Mr. Ha swung his left arm that Officer Collom was
13  trying to control, what's the very next thing that happened?
14  A.    Mr. Ha began to turn almost like a pirouette as he was
15  trying to struggle, and I eased up on him so he would have
16  less of a base to fight with Officer Collom, and he continued
17  to turn like a circular motion.  So -- and both Officer Collom
18  and myself maintained our position in relation to his body, me
19  being on his right side and Officer Collom being on his left
20  side, as he continued to turn into the circle.
21         MR. ROSS:  Could the record reflect, you Honor, that
22  Officer Rhoden is indicating with his two hands a
23  counterclockwise turning motion?
24         THE COURT:  All right.
25         MR. ROSS:  Q.  So as the defendant turned around in
26  a counterclockwise motion, did that cause your position and
27  Officer Collom's position to change?
28  A.    Yes, it did.

34

1  Q.    And did you move to any particular direction in the

2  building?

3  A.    We moved east towards the -- towards the east wall and

4  the north wall, so towards the northeast corner of the

5  hallway.

6  Q.    And that's the vertical wall you have listed above the

7  stairs on the right portion of your diagram?

8  A.    Yes, it is.

9  Q.    What did you do as Mr. Ha started to struggle and turn?

10 A.    I eased up on my grip and kind of wanted to see what he

11 was going to do, 'cause oftentimes people will let their

12 emotions get the best of them and they'll start to do

13 something and then they'll realize that, you know, "Well, what

14 am I doing?" and they'll stop, but that wasn't the case this

15 time.

16 Q.    How would you describe Mr. Ha's body at this point?

17 A.    Pretty rigid and almost, like, flexing like.  You know,

18 he was like in a -- like a -- I don't know how else to say

19 it -- like a fighting stance, you know.  He was -- I mean, he

20 went in your typical, like, fighting stance, because we were,

21 you know, kind of holding -- trying to hold on to him, but he

22 was real rigid.  And I'd say his feet were probably about

23 shoulder width apart and he was kind of -- you know, kind of

24 crouched trying to use his body momentum to get away from us.

25 Q.    Was he trying to use both arms in his efforts to break

26 free?

27 A.    Well, he was trying to use his right arm, but since I

28 still had a hold of it -- I had a firm -- my hands were firmly

35

1   grasped on his arm, but I was allowing him to move it around
2   some.  It wasn't going anywhere since I had a hold of it, but
3   I was less rigid with my arms, but my grip was firm on his
4   right arm.

5        And Officer Collom, it appeared from my vantage point,
6   he had a pretty firm grip.  And Mr. Ha took his elbow and
7   started elbowing the wall with Officer Collom's hand on Ha's
8   left elbow.  It caused Officer Collom's hand to be smashed in
9   the wall and I --

10  Q.   Now, before that happened, were you saying anything to
11  the defendant at all?

12  A.   I told him that he needed to stop resisting or I was
13  going to take him down to the floor.  I told him to stop
14  fighting.

15       And Officer Collom put out over the air that -- he
16  stated 243 over the air, which is -- it's a lot easier to say
17  over the air than he's fighting.  243, that means battery on a
18  police officer.  That's the Penal Code section.  So he put out
19  243 over the radio and we kept telling him that he needed to
20  stop fighting us, and that if he didn't stop fighting us, I
21  was going to put him on the ground.

22  Q.   How long did Mr. Ha struggle with you and Officer Collom
23  before he smashed Officer Collom's hand with his elbow into
24  the wall?

25  A.   Pretty quick.  You know, five seconds maybe.  Three,
26  four seconds.  It was pretty -- it was all -- you know, it was
27  pretty quick from the going to grab his arm to him standing
28  up, turning and, you know, elbowing the officer's hand into

1  the wall.  It was pretty fluid.

2  Q.    What was the distance you traveled from the initial

3  point of the bench until you reached the point of the wall as

4  defendant was spinning around?

5  A.    I would say five to six feet.  Probably about the width

6  of your desk there.

7  Q.    How would you describe the strength of the defendant in

8  his efforts to break free of your grasp?

9  A.    He succeeded to pull from Officer Collom's grasp.  He

10  wasn't able to get out of my grasp, but he was pretty strong.

11  Q.    Where were you at the point where the defendant smashed

12  with his elbow Officer Collom's hand into the wall?

13  A.    I was still on the defendant's right side.

14  Q.    And Officer Collom was still on the defendant's left

15  side?

16  A.    Well, after the smashing of the hand, he turned, still

17  being on his left side, but more facing him from the front.

18  Q.    Now, with as much specificity as you can recall,

19  describe how the defendant initially caused Officer Collom's

20  hand to go into the wall.

21  A.    With his elbow?  When you attempt to get somebody in a

22  wristlock, you put one hand on the elbow and one hand on the

23  wrist and you're attempting to put their wrist behind their

24  back.  So you kind of have it -- so you kind of have it like

25  this.  This being the elbow and this being the wrist.  And you

26  want to kind of hold it almost like in a -- like accordion

27  like behind their back where --

28  Q.    Let me stop you for a minute.

34

1   Let the record reflect the officer has taken an
2   approximately 12-inch -- 11-inch in length folder.  He's
3   holding the vertical bottom of the folder with his left arm
4   indicating the elbow, and then out to his right arm at the top
5   of the document with his right hand indicating where the wrist
6   on the arm would be.

7           THE COURT:  Yes.

8           MR. ROSS:  He's holding it horizontally in front of
9   his chest.

10          Okay.  Thank you.

11          THE WITNESS:  I misspoke because I was on his right
12  side, but for Officer Collom it would be the opposite.  This
13  would have been the elbow.  Wait.  Yeah, this would have been
14  the elbow because he had not yet put his wrist behind his
15  back.  So this being his wrist, he hadn't yet, you know,
16  maneuvered the wrist behind his back.  So this was his hand on
17  his elbow and this was his hand on his wrist and the --

18          MR. ROSS:  Q.  Let me stop you again.  You're doing
19  a lot of verbal and physical gesturing.

20          Let the record reflect the officer is still holding the
21  same document with the same arms, but he has reversed the
22  positions.

23          THE COURT:  All right.

24          THE WITNESS:  And the -- Mr. Ha repeatedly struck
25  his elbow back to the east wall smashing Officer Collom's hand
26  into the wall.

27          MR. ROSS:  Q.  Now, could you actually see the
28  defendant slamming his left arm and elbow into the wall?

38

1   A.   I only actually saw the smashing of the hand once, but I

2   continued to see the repetitive motion.  And the reason I

3   didn't see any contact was because it was blocked by the

4   defendant's torso.  It was between myself and the point on the

5   wall.

6   Q.   How far was Officer Collom from the wall when the

7   defendant started smashing his hand into the wall?

8   A.   Just a few inches.  I would say his foot was probably

9   six inches from the wall.  He was probably standing right next

10   to the wall.

11   Q.   Did you hear Officer Collom react at all to the slamming

12   of his hand into the wall by the defendant?

13   A.   Yes.  I specifically remember him yelling the word

14   "Ouch."

15   Q.   So he actually yelled the word "Ouch"?

16   A.   He actually yelled the word "Ouch."

17   Q.   Now, after the defendant slammed Officer Collom's hand

18   in the wall repeatedly, what happened immediately after that

19   point or what were you doing?

20   A.   I was continuing to tell him to stop fighting and I

21   continued to tell him that if he did not stop fighting he was

22   going to wind up on the floor.

23   Q.   Would you say the defendant was putting up a pretty good

24   struggle right at that point?

25   A.   I would say so.  Better than average.

26   Q.   Did the defendant respond at all to your orders to stop

27   resisting, that he was under arrest?

28   A.   He did not.

1    Q.    Did he stop -- did he respond to your orders that if he
2    didn't stop resisting, you would have to take him to the
3    ground?
4    A.    He did not.  The only thing he did verbally was kind of
5    grunting.
6    Q.    What was your goal at this point?
7    A.    At this point I wanted to put him in handcuffs for his
8    safety and ours.
9    Q.    What happened next?
10   A.    Officer Collom applied a knee lift to Mr. Ha's stomach
11   and chest area, his torso.
12   Q.    Without demonstrating, could you describe a knee lift?
13   A.    Typically it's done from the front corner of someone's
14   body.  You would grab their shoulders, and depending on which
15   side you were on, you would basically knee them in the torso.
16   Q.    And where is that technique learned, taught?
17   A.    It is taught -- I was taught that maneuver at the
18   Alameda County Sheriff's Academy and also at the in-house
19   defensive tactics training with my department.
20   Q.    What's the purpose of that procedure?
21   A.    To kind of stun, stun the subject, get him off of his
22   guard.
23        It's typically more effective with officers that aren't
24   as strong as the defendant 'cause your legs are the stronger
25   part of your body usually than your arms.  So, you know, it's
26   a way to apply force to someone that you couldn't apply with
27   your upper body and it's an attempt to gain control of the
28   defendant.

40

1   Q.   And what's the point of continuing to tell a suspect

2   that they're under arrest or to stop fighting?

3   A.   To make it clear that that's what's going on, that we're

4   not just there, you know, to mess with them, you know.   I

5   wanted there to be no doubt in anybody's mind, specifically

6   his, that what we were doing was trying to arrest him.

7   Q.   Did the defendant -- what happened after Officer Collom

8   did the knee to the abdomen area?

9   A.   He kind of caught the defendant off his guard and

10  enabled us to move away from the wall.

11  Q.   And after you got away from the wall, at that point were

12  you still trying to maintain your grasp of the defendant?

13  A.   No.   I let go of his arm at that point and kind of

14  maneuvered myself behind him, but still on the right half of

15  his body but behind him.

16  Q.   Now, at that point were you able to tell what

17  Officer Collom was doing or were you concentrating on your

18  efforts?

19  A.   I was concentrating on my efforts.

20  Q.   And what were you trying to do?

21  A.   Well, at that point I was attempting to get behind him.

22  And I again told him that he needed to stop fighting or I was

23  going to take him to the ground.   And he -- excuse me.   He did

24  not stop fighting, so with my right arm I reached down and

25  swept his legs out from under him and he went down on all --

26  on his hands and knees.

27  Q.   And how did you sweep his legs out with your arm?

28  A.   I have pretty long arms, so I literally just reached

4

```
 1   down and pulled his legs out from under him.
 2   Q.    Thank you.
 3         Let the record reflect that the witness reached his
 4   right arm forward and pointed it down towards the ground and
 5   then pulled his arm in an upward backward motion as if to be
 6   starting a lawn mower.
 7              THE COURT:   Fine.
 8              MR. ROSS:   Q.   Pulling out the legs of the
 9   defendant, did that cause any part of his body to go down to
10   the ground?
11   A.    Yes, his hands and knees.
12   Q.    Did the defendant land on his hands and knees?
13   A.    Yes, sir.
14   Q.    After the defendant went to his hands and knees, what,
15   if anything, happened then?
16   A.    Officer Collom sprawled on Mr. Ha's upper body and I was
17   laying on Ha's legs and I grabbed Ha's left arm.  At that -- I
18   would need to look at my report to remember exactly which -- I
19   believe I grabbed his left arm, but to be exactly sure I need
20   to look at my report.
21   Q.    At this point or up until this point had the defendant
22   at any time complied with any of your orders?
23   A.    No.
24   Q.    And up until this point had he continued to resist your
25   efforts?
26   A.    Continuously from the start.
27   Q.    And at any time up to this point had he reduced his
28   level of resistance?
```

```
 1   A.     No.   I'd say it got stronger as it kept going.

 2   Q.     Was the defendant saying anything at all during this or

 3   making any noise?

 4   A.     He was grunting.

 5   Q.     And were you able to see his face during all of this

 6   struggle?

 7   A.     When we were still standing up up against the wall I was

 8   able to see his face.

 9   Q.     How would you describe the expression, if you would at

10   all, on his face?

11   A.     Like pretty tight-faced, and, like I said, he was

12   grunting.   Like I guess what it would look like if you were

13   growling.   That's what his face looked like.   I don't know how

14   else to describe it other than that.

15   Q.     Now, at some point ultimately were you able to handcuff

16   the defendant?

17   A.     Yes.   I -- again, believing it was his left arm, I put

18   his left arm behind his back and tucked his right arm

19   underneath his torso, and Officer Collom was able to wedge his

20   right arm out from behind him and place it behind his back.

21   And I placed him in handcuffs and I put out over the air that

22   he was in handcuffs and for the units -- knowing that we put

23   out 243 so people were coming Code 3, to go ahead and slow

24   down, that he was in cuffs and that at that point it was

25   Code 4 as far as any danger that we were in.   And I stood him

26   up and sat him on the bench.

27          And then at that point Dispatch asked if we still needed

28   more units there, and I said yeah, we probably could use,
```

43

```
 1   well, the sergeant and we probably could use another officer.
 2   Q.    Now, as to which arm you were able to get when you were
 3   trying to handcuff defendant, are you not sure about which arm
 4   that was?
 5   A.    I would say I'm almost positive it was his left arm, but
 6   it was over nine months ago, so I don't remember.  I've read a
 7   lot of reports since then, so...
 8   Q.    Would it help you to specifically recall that by looking
 9   at that portion of your report --
10   A.    Yes.
11   Q.    -- and reviewing it?
12   A.    Yes, it would.
13   Q.    If it would help you, please review that portion.  And
14   then after you've reviewed it, if your memory is refreshed or
15   changed in the refreshed sense, please look up.
16   A.    Yes.  I originally misspoke.  I placed his right arm
17   behind his body and Officer Collom placed his left arm behind
18   his body.
19   Q.    And during that time did the defendant continue to
20   struggle?
21   A.    With Officer Collom.  I pretty much got his arm behind
22   his back immediately.
23   Q.    All in all would you say this was a pretty violent
24   struggle on the defendant's part?
25   A.    Yes.
26   Q.    Did you attempt -- strike that.
27         Up to the point where you finally handcuffed the
28   defendant, had he ever offered his name or any identification?
```

44

1  A.   No.

2  Q.   After the time when the defendant was now handcuffed and

3  seated back on the bench, did you make any effort to search

4  him incident to your arrest?

5  A.   I did, but he continued to -- his arms being handcuffed

6  behind his back, he continued to shift his weight back and

7  forth, kind of not wanting me to touch him or search him.  So

8  at that point we decided to wait for another officer to get

9  there and Officer Collom and I both stepped back from him

10  because he wasn't going anywhere.  He was in handcuffs and he

11  was sitting on the bench.  We felt that we weren't in danger,

12  so we went ahead and backed off and waited for the sergeant to

13  arrive.

14  Q.   Where did you step back to?

15  A.   I stepped back to -- with Mr. Ha being on the bench, I

16  stepped back and away from his right side, and Officer Collom

17  did the opposite, backing away from his left side.  Yeah, his

18  left side.

19  Q.   Now, at some point was anyone able to ascertain the

20  defendant's identity or obtain any identification?

21  A.   Ha said that his I.D. was in his pocket and he kept like

22  looking down to his right pocket around his abdomen level.  He

23  had like a puffy vest on.  And Officer Collom retrieved it.

24  And Ha said something to the effect of, "Now you have my

25  identification.  You can just let me go."

26  Q.   Did the defendant complain of any pain at that point?

27  A.   Yeah.  He stated that his chest hurt and that his head

28  hurt and he was able to -- he had a visor on, like a golf-type

45

1   visor, and he -- at that point he was able to -- he worked it

2   off his head with his shoulder and revealed a reddish mark on

3   his forehead.

4   Q.   Now, looking at the mark on the forehead, were you able

5   to ascertain whether or not it was a fresh mark?

6   A.   It appeared that it wasn't fresh, but I can't really say

7   because I didn't see it until after he took off the visor, you

8   know, which would cause me to assume that it was there before

9   the altercation.  It almost looked like a rope burn.

10  Q.   And was the abrasion in the same spot where the visor

11  had been sitting?

12  A.   Yes.

13  Q.   Did you -- at any time during your attempt to handcuff

14  the defendant or control the defendant during the struggle did

15  you ever see his head hit anything?

16  A.   No, I did not.

17  Q.   Did his head hit the wall or the ground when he went to

18  his hands and knees?

19  A.   I'm positive his head did not hit the ground.  Whether

20  or not his head hit the wall, I can't speak for sure, but if

21  he had hit his head on the wall, it would have been the back

22  of his head, not the front of his head.

23  Q.   Could you describe for the Court what Mr. Ha was wearing

24  that day?

25  A.   He was wearing like rain pants, they kind of looked like

26  fishing waders, dark puffy-type vest, a light blue to white to

27  off-white button-up shirt, and I believe he had like a

28  leather-type thin material vest on.

46

1    Q.    Did you ascertain whether or not he had any other pants
2    on?

3    A.    I did.  He did have another pair of pants -- at least
4    another pair of pants on, because during the struggle the
5    rubber outer pants that he had kind of slipped -- kind of
6    slipped down and I saw that he had another pair of pants
7    underneath.  I would say they were dark pants.  Whether they
8    were brown or black, I do not recall.

9    Q.    Did Mr. Ha have any other complaints after his arrest?
10   A.    Yes.  He stated that he had defecated in his pants and
11   that we needed to clean it.

12   Q.    How did he inform you that you needed to the clean it?
13   A.    He told us -- he told Officer Collom that -- he said, "I
14   defecated in my pants, Officer.  You need to clean me."  And
15   he was -- it appeared he was talking to Officer Collom.

16   Q.    Can you describe his tone of voice at that point?
17   A.    Stern, almost as if he was ordering us to do it.

18   Q.    During your whole entire contact with Mr. Ha, when there
19   was actual conversation, words exchanged, did he consistently
20   have an ordering tone of voice with you?

21   A.    Yes, he did.

22   Q.    Did anyone else arrive on scene after the defendant's
23   arrest?

24   A.    Yes.  In the hallway Sergeant Alex Yao arrived on the
25   scene and Officer Devin Kochis arrived and then later in the
26   plaza on the west side of the building Officer Sean Aranas
27   arrived on the scene to transport.

28   Q.    Now, were any of those officers present during your