exh 4 Rep Tr   pp 47 - 72

47

COPY

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

BEFORE THE HONORABLE WINTON McKIBBEN, JUDGE

DEPARTMENT NO. 109

ENDORSED
FILED
ALAMEDA COUNTY

MAY 0 9 2002

THE PEOPLE OF THE STATE OF THE SUPERIOR COURT NO. 166802
CALIFORNIA,                    By _____
                                              Deputy

       Plaintiff,

       Vs.

HUNG HA,

       Defendant.

_____/

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**JURY TRIAL**

WILEY W. MANUEL COURTHOUSE
OAKLAND, CALIFORNIA

FRIDAY, DECEMBER 21, 2001

APPEARANCES:

For the People:                ANDREW ROSS
                               Deputy District Attorney


For the Defendant:             HUNG HA
                               In Propria Persona



**000198**

48

1                          I N D E X

2

3                    W I T N E S S E S

4  FOR THE PEOPLE:              DIR   CRO   RED   REC   VD

5  OFFICER JASON COLLOM          1    56    92
   (Further by Mr. Ross)                    98

6  OFFICER DEVIN KOCHIS         101   113   119

7

8

9

10

11  FOR THE DEFENDANT:

12  MARILYN SCHAEFFER           135   140   142   146

13  ROGER SPENCER               147   150

14

15

16

17                   E X H I B I T S

18  FOR THE PEOPLE:                    IDENT.    IN EVID.

    Exhibits 6-A - 6-B                              100
19
    Exhibit 7                          13
20
    Exhibit 8                          14
21
    Exhibit 9                          110
22

23

    FOR THE DEFENDANT:
24
    Exhibits A-1 - A-9                 1
25

26

27

28

49

1   of them, that plan on sleeping out, they like to pick the

2   remote areas away from disturbances, away from custodians and

3   also police officers that roam the building.

4   Q.   So the remote areas then have a lower chance of

5   discovery?

6   A.   Yes.

7   Q.   Is that then why you and your other officer members

8   patrol these buildings?

9   A.   Yes.

10  Q.   Now, on March 4th, 2001, in that 30 seconds you walked

11  down the hall or anytime thereafter that night while you were

12  there, did you observe any other actual physical activity on

13  that second floor?

14  A.   No, I didn't.

15  Q.   And in your endeavor to get to Officer Rhoden's

16  location, other than the people you saw downstairs, as you

17  were traversing up the stairs did you see any other activity

18  in the building?

19  A.   No.

20  Q.   Now, when you got to Officer Rhoden's side, what was

21  Officer Rhoden doing?

22  A.   Officer Rhoden was standing there listening to the

23  defendant talk.

24  Q.   Did Officer Rhoden at any point say anything?

25  A.   As I recall, Officer Rhoden said -- told him that he was

26  trespassing, that's why he's talking to him at the moment.

27  Q.   Now, did he ever ask the defendant for any

28  identification or anything of that sort?

50

1   A.    Yes.

2   Q.    And what happened?  I mean, could you describe for the

3   Court what Officer Rhoden attempted?

4   A.    Officer Rhoden explained to the defendant that -- the

5   reason why he was being investigated and also asked him for

6   his identification so we can know who we're dealing with at

7   that time.

8   Q.    And what tone of voice would you say Officer Rhoden was

9   using?

10  A.    Officer Rhoden was speaking real softly.

11  Q.    Did Officer Rhoden ever indicate to the defendant what

12  might happen if everything did check out with his

13  identification?

14  A.    Yes.  He told him that if everything checks out, then

15  he's going to fill out an interview card and be on his way

16  out; but if he refuses to identify, we must identify him.

17  Q.    How did the defendant -- excuse me.  How did the subject

18  react to that?

19  A.    The subject was really mad about that.  He was angry.

20  Q.    And did he make any statement about that?

21  A.    I recalled he said, "This is illegal and I don't have to

22  identify myself to you."

23  Q.    The person that Officer Rhoden was talking to, do you

24  see that person in this courtroom here today?

25  A.    Yes, I do.

26  Q.    Could you please identify that person by where that

27  person is sitting and approximately what that person is

28  wearing?

51

1  A.    That person is sitting at the table in front of the
2  deputies as the defendant and he's wearing the collared shirt
3  with a beard.

4          MR. ROSS:    May the record reflect that the witness
5  has identified Mr. Ha?

6          THE COURT:    It will.

7          MR. ROSS:    Q.    How long did this exchange back and
8  forth go on?

9  A.    Probably -- between Officer Rhoden and Hung Ha?

10  Q.    Yes.

11  A.    Probably about a minute.

12  Q.    During that time did Officer Rhoden continue to explain
13  to defendant why he needed the identification?

14  A.    He tried, but most of the time was unable to overpower
15  or speak over the defendant's loud tone of voice.

16  Q.    So then the defendant, did he continue to speak in a
17  loud tone?

18  A.    Yes, he did.

19  Q.    And did he continue to say the same things back to
20  Officer Rhoden?

21  A.    Yes, he did.

22  Q.    Now, at some point did Officer Collom -- or excuse me --
23  Rhoden give up trying to talk to the defendant?

24  A.    I actually asked Officer Rhoden to stop and I said, "Let
25  me try."

26  Q.    And where were you at that point?

27  A.    I was still standing in front of the defendant on the
28  right side of Officer Rhoden.

1    Q.    Had either you or Officer Rhoden changed your position

2    at any time?

3    A.    No.

4    Q.    Had the defendant changed his position at any time?

5    A.    Other than moving around in a stationary spot, no.

6    Q.    Now, when you first arrived at the scene, could you

7    describe the setting around the defendant?

8    A.    Yes.    The defendant was sitting on the bench towards one

9    end of the bench and there were what appeared to be

10   belongings, backpack, duffel bags, and just debris sitting

11   around him and on the floor adjacent to him.

12   Q.    And did you see anything else on the bench with him at

13   all?

14   A.    I remember seeing -- what was odd was an alarm clock

15   adjacent to where the subject was.

16   Q.    And was that on the bench or on the window ledge or the

17   floor?

18   A.    That I recall was on the bench and to the right side of

19   the defendant.

20   Q.    Did the defendant have any other property that you

21   noticed?

22   A.    Just baggages and what appeared to be personal

23   belongings.

24   Q.    Did he have any food or anything like that with him?

25   A.    He had a plastic Tupperware type of container with a

26   lump of food inside and a fork through it.

27   Q.    Now, Officer, do you recall specifically how everything

28   was distributed on the bench?

1    A.    No, I don't.

2    Q.    Why is that?

3    A.    Because at that time I was more focused in on a subject

4    that's screaming at another officer than his immediate

5    surroundings.

6    Q.    Why were you more focused on the subject, Mr. Ha?

7    A.    Because I felt threatened by the subject's screams and

8    yells.

9    Q.    Had you seen Mr. Ha before March 4th?

10   A.    No.

11   Q.    How tall are you?

12   A.    I'm 5'8".

13   Q.    How much do you weigh?

14   A.    About 130.

15   Q.    Based on your experience working with the University of

16   California, Berkeley Police or any other school for that

17   matter, the scene that you came upon with Mr. Ha, what did it

18   look like to you?

19   A.    It looked like somebody setting up for camping.

20   Q.    What about it looked that way to you?

21   A.    With the items laid out and the alarm clock to the side

22   and just personal belongings that are set up as of -- it's

23   made to be comfortable to lay down on.

24   Q.    Did that area look consistent with other settings in

25   which you've come across lodgers?

26   A.    Yes.

27   Q.    Did you make an attempt to talk with the defendant?

28   A.    Yes, I did.

1  Q.   Did you attempt to employ any particular technique in

2  talking to this man who was screaming at Officer Rhoden?

3  A.   Yes, I did.

4  Q.   What did you attempt to do?

5  A.   I tried to diffuse the situation by talking in a real

6  soft tone and talking about other things before coming back to

7  explaining what the issue was.

8  Q.   Now, Officer, in your experience or history, have you

9  received any training in that area, diffusing a situation?

10  A.   Yes.

11  Q.   What kind of training?

12  A.   In the academy, unusual circumstances.

13  Q.   So that's unusual circumstances training?

14  A.   Yeah, part of it.  And also you're always taught to

15  diffuse a situation by going in the lowest level possible, and

16  that's reinforced throughout the academies.

17  Q.   Is that why you tried to use this low calm voice with

18  Mr. Ha?

19  A.   Yes.

20  Q.   What exactly did you do when you initially attempted to

21  speak with Mr. Ha?

22  A.   At first he was still talking and I just began speaking

23  to him.  I said "Hey, everything is okay.  It's no big deal,"

24  and explained to him why we're there.

25  Q.   So did you make any effort to explain to him legally why

26  you guys were talking to this man?

27  A.   Yes, I did.

28  Q.   And what efforts did you make?  What results did they

1   produce?

2   A.    I told him why we need to talk to him and what were the

3   elements of trespassing and lodging and I also told him why he

4   needs to identify himself.  And at one point he said that,

5   "Other students were in the building; therefore, I can be in

6   the building."  So I asked him if he was a student and he said

7   that he wasn't going to tell me anything because it's none of

8   my business.

9   Q.    Now, did you ever attempt to indicate to him your need

10  to know who's in these buildings?

11  A.    Yes.

12  Q.    What did you tell him?

13  A.    I said that, "You need to be a student to be in this

14  building and you need to have proper identification that

15  indicates that you belong to the university to be in the

16  building."

17  Q.    How did Mr. Ha respond, if at all, to that?

18  A.    Mr. Ha refused to go in that direction and instead

19  continued on in his rage about legality.

20  Q.    So was Mr. Ha telling you that what you were doing was

21  illegal?

22  A.    Yes.

23  Q.    Now, in your efforts to talk to Mr. Ha, did you ever try

24  to figure out how to address him in any way?

25  A.    No, I didn't.  I asked Mr. Ha how I could address him,

26  and he said I could call him anything I'd like.

27  Q.    But he wouldn't give you his name?

28  A.    No.

DEANNA HILL, CSR #8765

```
 1   Q.   Now, at this point was Mr. Ha in any way subdued by

 2   either of you or restrained, handcuffed, anything like that?

 3   A.   No.

 4   Q.   So nobody's position had changed?

 5   A.   No.

 6   Q.   Two officers standing at some distance talking to

 7   Mr. Ha?

 8   A.   Yes.

 9   Q.   What's Officer Rhoden doing during this time?

10   A.   Officer Rhoden was staying quiet and trying to think of

11   what the next step was going to be and how to diffuse the

12   situation.

13   Q.   So he looked like he was thinking?

14   A.   You know, at the time I was focused in on Mr. Ha.

15   Q.   So you're not really paying attention to Officer Rhoden?

16   A.   No, I wasn't.

17   Q.   Was Mr. Ha yelling all his responses?

18   A.   Yes.

19   Q.   Describe the demeanor on his face, if you recall.

20   A.   I remember he had a cherry red face and spittles came

21   out of his mouth and he just looked angry.

22   Q.   Did he look out of control to you?

23   A.   Yes.

24   Q.   Did you make any effort to explain to the defendant how

25   simple a contact this was?

26   A.   Yes, I did.

27   Q.   What effort did you make?

28   A.   I told him that this was really no big deal and "As soon
```

1    as we figure out who you are, you don't have a warrant on you,

2    you can be on your way out.  It's really not that big of a

3    deal and nothing to get that angry over."

4    Q.    Why did you attempt to explain that to the defendant?

5    A.    Because it started out as a very simple stop with a very

6    simple solution.  He's -- I don't know whether he's been field

7    interviewed before and I need to know whether we have records

8    of him doing the same things before I can disposition how I'm

9    going to handle this incident.

10   Q.    How did Mr. Ha react to that dialogue?

11   A.    He just kept repeating that it was illegal and he wasn't

12   going to cooperate and he said, "Just leave me."

13   Q.    Now, were you still talking in that same low calm voice?

14   A.    Yes.

15   Q.    Were you still trying to de-escalate?

16   A.    Yes.

17   Q.    And based on your experience and your having been at

18   this scene, did you feel you were having any success with your

19   efforts?

20   A.    No.

21   Q.    Defendant, did he -- how did he tell you to leave him

22   alone?

23   A.    He said, "Leave me.  Just leave me."

24   Q.    And what did you do, if anything?

25   A.    And I told him that I couldn't leave and I explained the

26   reason why I couldn't leave.

27   Q.    Now, at this point how much time had passed from the

28   time you arrived?

DEANNA HILL, CSR #8765

58

1    A.    Estimating three minutes.

2    Q.    In your presence how many times had Officer Rhoden

3    explained to the defendant the purpose of detention?

4    A.    In my presence it was at least five times.

5    Q.    And since you arrived how many times did you explain to

6    this point to Mr. Ha the purpose for the detention?

7    A.    At least five times.

8    Q.    And combined from the time you arrived until the point

9    we're now at in the dialogue, how many times had you and

10   Officer Rhoden requested the defendant's identification or

11   name?

12   A.    At least ten times combined.

13   Q.    At any point during all of this exchange had the

14   defendant ever calmed or complied in any respect?

15   A.    No.

16   Q.    What happened next?

17   A.    Hung Ha tried to stand up.  He said, "I'm going to leave

18   now."

19   Q.    And what did you or Officer Rhoden do when Mr. Ha stood

20   up?

21   A.    We said, "No, you can't leave."  And I moved in on Hung

22   Ha's left side to try to gain control of his left arm, and

23   Officer Rhoden moved in on the right side of Mr. Ha to try to

24   control his right arm, and put him in some kind of a

25   wristlock.

26   Q.    Now, at this point do you know if anybody informed him

27   if he was under arrest or not?

28   A.    At this point, yes.  I actually started saying that,

```
1    "You're under arrest.  Do not resist.  Don't fight us."

2    Q.   Do you recall if Officer Rhoden had indicated the

3    defendant was under arrest?

4    A.   Yes.  He said, "Stop fighting.  You're under arrest.  We

5    got to go -- we got to take you."

6    Q.   Was Mr. Ha informed he was under arrest before you

7    grabbed -- tried to grab hold of him?

8    A.   No.

9    Q.   At what point did anyone first inform Mr. Ha of this

10   fact?

11   A.   At the point where we made contact with Hung Ha and he

12   started flailing his arms about to try to get away from us.

13   Q.   Where were you located when you first tried to take hold

14   of Mr. Ha's arm?

15   A.   I was on the left side of Hung Ha in front of him.

16   Q.   At the time you and Officer Rhoden decided to arrest

17   Mr. Ha, what was he being arrested for?  Do you recall?

18   A.   I'm trying to remember the wording of one forty -- it's

19   delaying, obstructing and also trespassing, if that proves so.

20   Q.   I have a diagram here.  It was drawn earlier.  Does this

21   diagram depict the location of you in relationship to Mr. Ha

22   and Officer Rhoden at the time of the attempt to effectuate

23   the arrest?

24   A.   Yes.

25   Q.   And were you attempting to arrest Mr. Ha when he was

26   standing up?

27   A.   Yes, he started standing up.

28   Q.   Describe your efforts to take control of Mr. Ha's left
```

1    arm.

2    A.    I placed my right hand on his -- on the back of his

3    elbow and tried to put my left hand on his hand to put him in

4    a rear wristlock, but the defendant balled up his fist and

5    just tensed up that arm, so I was unable to effect the control

6    hold and just tried to hang on as much as I can just so he

7    can't swing that arm at Officer Rhoden or I.

8    Q.    Did the defendant have significant upper body strength?

9    A.    He did.

10   Q.    And did you feel somewhat overpowered by that strength?

11   A.    I did.

12   Q.    Would you say Mr. Ha was a larger man than you?

13   A.    I would.

14   Q.    What happened next?

15   A.    He stood up all the way.  We weren't able to keep him

16   down.  And I recall trying to hang on to his elbow and not

17   make any efforts with the -- I mean not making any way with

18   the hand because it was balled up.  And he spun on -- from his

19   right side to left side to try to swing Officer Rhoden's grip

20   away from his right arm.

21   Q.    So he spun counterclockwise?

22   A.    Spun counterclockwise.

23   Q.    And by the defendant spinning counterclockwise, what

24   effect did that have on you, if any?

25   A.    I essentially was the pivot point and pivoted on me and

26   effectively pinned me up against the side of the bench and the

27   wall a little bit.

28   Q.    So did that change your location?

DEANNA HILL, CSR #8765

61

1  A.   I was still in the same area, but just facing another

2  way.

3  Q.   And did the struggle continue at that point?

4  A.   The struggle continued.

5  Q.   And where did the struggle take you?

6  A.   The struggle -- eventually Mr. Ha spun from his left

7  side to his right side and effectively pinned me up against

8  another wall and pinned my hand up against another wall.

9  Q.   Which wall -- if you could write on the handwritten

10  diagram here with a green pen C1 where you were pinned against

11  the wall.

12  A.   (Witness complies.)

13  Q.   How much distance would you estimate was traveled to

14  that location before you were pinned up against the wall?

15  A.   About seven -- seven feet.

16  Q.   How soon -- after you first attempted to restrain Mr. Ha

17  until you arrived at the location of C1, how much time passed?

18  A.   To me it felt like forever, but I'm sure it was within

19  seconds.

20  Q.   So this was a pretty quick event in that regard?

21  A.   Yes.

22  Q.   From the time Mr. Ha started the spinning and the

23  flailing until the time you were at the C1 position, did

24  Mr. Ha ever calm down or comply with any of the attempts to

25  restrain him?

26  A.   No.

27  Q.   What was he doing during all that time?

28  A.   He was -- he was focused in on trying to ball up his

1  fists and get away from us and fighting us.  And I recall keep

2  telling him, "You're under arrest.  Do not fight.  You're

3  under arrest.  Do not fight," but he continued on.  And I

4  recall him saying, "Don't do this."

5  Q.    Now, why were you or Officer Rhoden telling defendant he

6  was under arrest, not to resist, not to fight?

7  A.    Because we didn't want to get hurt and we didn't want

8  him to get hurt.

9  Q.    Could you see Mr. Ha's face during this struggle?

10  A.    Yes.

11  Q.    Describe his demeanor.

12  A.    He was very angry.  His face was the same as about

13  before, red, and he was really tense.  And I recall focusing

14  on that balled up fist because I didn't want to be punched.  I

15  saw the veins behind his hand.

16  Q.    And all this while during the struggle were you still

17  trying to hold on to the left arm?

18  A.    Yes, I was.

19  Q.    And was the defendant making any effort to break that

20  left arm free of your grasp?

21  A.    Yes, he did.

22  Q.    What was he doing?

23  A.    When we got up to the wall where I marked, we were

24  all -- we all had our backs towards that concrete wall and the

25  defendant -- my right hand was still hanging on to the

26  defendant's elbow and the defendant repeatedly elbowed my hand

27  into the concrete wall.

28  Q.    Now, could you describe how that occurred best you can?

63

1   A.    Yes.   Since I was hanging on to the back of his elbow,

2   he just kept slamming his elbow back using my hand as a

3   padding against the hard wall.

4          MR. ROSS:   Your Honor, could the record reflect that

5   using his left arm at about a 45-degree angle from his waist

6   area and thrust horizontally backwards Officer Collom

7   indicated movement of the elbow toward the wall?

8          THE COURT:   All right.

9          MR. ROSS:   Q.   Now, your hand was behind his elbow?

10  A.    Yes.

11  Q.    So the palm of your hand was gripping the elbow area of

12  Mr. Ha's left arm?

13  A.    Yes.

14  Q.    Was it your left or right hand?

15  A.    It was my right hand.

16  Q.    So your right hand.   And with your right hand behind

17  Mr. Ha's left elbow was he thrusting the arm into the wall

18  where your hand was?

19  A.    Yes, he was.

20  Q.    And how many times did he do this?

21  A.    He did it repeatedly.   And it felt like many times, but

22  an estimate would be at least five times.

23  Q.    All the while that you were attempting to maintain your

24  grip of the left arm and defendant was thrusting the elbow

25  into your hand against the wall, did his elbow ever touch the

26  wall?

27  A.    No, only my hand.   My hand padded his elbow.

28  Q.    Did you feel any initial pain when Mr. Ha was thrusting

1    your hand into the wall?

2    A.    Yes, I did.

3    Q.    What did you feel?

4    A.    It was pain shooting through my knuckles and the back of

5    my hand in the small bones.

6    Q.    Any other kind of sensation?

7    A.    Yeah.   It was just a hand slamming up against the wall.

8    And I remember saying -- in reflex I said, "Ow.   Stop."

9    Q.    And did that have any impact on Mr. Ha's efforts?

10   A.    He banged it up a little bit harder to try to get away

11   from me.

12   Q.    So then with Mr. Ha banging his elbow into your hand

13   against the wall, did you lose your grip?

14   A.    I hung on to it as much as I could, but I don't think my

15   hand ever left the back of the elbow, despite the pain.

16   Q.    Did you have control of Mr. Ha at all at that point?

17   A.    No, I didn't.

18   Q.    And were you concerned for your safety at that point?

19   A.    Yes, I was.

20   Q.    Why?

21   A.    Because my hand was hurting and I could tell that he

22   would probably go a little further if he had the chance.

23   Q.    And he was still fighting you?

24   A.    Yes.

25   Q.    So what efforts did you make at that point to control or

26   restrain Mr. Ha?

27   A.    I tried a distracting blow.   Since I was standing next

28   to Hung Ha, it was the perfect location for a knee lift.

DEANNA HILL, CSR #8765

1   Q.   Did you try anything before the knee lift?

2   A.   I tried reaching around -- since I couldn't get a hold

3   of his balled fist, I tried reaching around his head to pull

4   him down.

5   Q.   And by doing that where in position to you was the

6   defendant?

7   A.   The defendant was immediately to my left side and facing

8   me.

9   Q.   And was Officer Rhoden still on the other side of the

10  defendant?

11  A.   Officer Rhoden was on the other side.

12  Q.   Were you paying attention much at this point to

13  Officer Rhoden's activities?

14  A.   No, I wasn't.

15  Q.   What were you focused on?

16  A.   I was focused on trying not to get further injuries and

17  focused on the suspect that's fighting us.

18  Q.   Now, all this time was anyone telling or ordering the

19  defendant -- ordering him to stop what he was doing?

20  A.   Yes.

21  Q.   Who?

22  A.   Officer Rhoden and I repeatedly told him, "Come on.

23  Stop.   Come on.   Stop."

24        THE COURT:   I'm going to interrupt now so we can

25  take the morning recess.

26        Ladies and gentlemen, remember the admonition.

27  You're not to discuss the case amongst yourselves or with

28  anyone else.   If anyone attempts to discuss the case with you,

1    please advise the Court of that fact.  We'll return at five

2    minutes after 11:00, five after 11:00.

3                   (Recess taken.)

4                   THE COURT:  All of the jurors are present, as is

5    Mr. Ross and Mr. Ha and the witness.  So proceed, please.

6                   MR. ROSS:  Thank you, your Honor.

7    Q.   Now, Officer Collom, after the defendant had repeatedly

8    slammed your hand into the wall with his elbow, you indicated

9    you tried to grab him with your hands by his head while facing

10   him?

11   A.   Yes.

12   Q.   And were you able to accomplish anything with that

13   effort?

14   A.   No.

15   Q.   Why not?

16   A.   He was stronger than me.

17   Q.   And at that point what, if anything, did you try to do?

18   A.   I performed a knee lift to his abdomen area.

19   Q.   What's the purpose of the knee lift?

20   A.   A distraction just so he will stop pounding my hand into

21   the wall.

22   Q.   Where did you learn that technique?

23   A.   In the police academies, plus on-service training.

24   Q.   When is that technique to be used?

25   A.   When the suspect is combative.

26   Q.   When you attempted the knee lift to the defendant, did

27   he ever say anything?

28   A.   Excuse me?

1   Q.   After you attempted the knee lift, did the defendant do

2   or say anything?

3   A.   I don't recall.

4   Q.   Did you actually complete the knee lift?

5   A.   Yes, I did.

6   Q.   And was the knee lift effective?

7   A.   I think it was effective.

8   Q.   Did the defendant do anything after you finished your

9   knee lift?

10  A.   He continued fighting and his head was leaned forward a

11  little bit.

12  Q.   And where was his head in relation to your chest?

13  A.   His head was now in front of my chest.

14  Q.   Okay.  What happened next?

15  A.   He drove his head into my chest to try to push me over.

16  Q.   The badge that you had on the outside of your jacket --

17  A.   Yes.

18  Q.   -- what was it made out of?

19  A.   Brass.

20  Q.   Where was it located?

21  A.   It's located on a badge tab on the jacket.

22  Q.   Physically where?

23  A.   On the upper left side of my jacket.

24  Q.   On your body where?

25  A.   On my body?  Probably right below the shoulder, the left

26  shoulder.

27  Q.   So on your left chest?

28  A.   Yes.

1  Q.    What happened after defendant drove his head into your

2  chest?

3  A.    I was losing grip on the elbow, I recall, and I tried to

4  use his momentum to pull him forward and continue to try to

5  take him down.

6  Q.    And what efforts did you make?

7  A.    After I was knocked back a couple feet, I recall

8  standing off to the side to try to get out of his way, and at

9  around the same time that's when -- that's when I think

10  Officer Rhoden off-balanced Mr. Ha.

11  Q.    Did you actually see the off-balance conducted by

12  Officer Rhoden?

13  A.    No.    I was too tied up with what I was doing.

14  Q.    Were you getting tired at this point?

15  A.    Yes, I was.

16  Q.    Why?

17  A.    Because it's -- one or two minutes doesn't seem like

18  much to anybody, but then when you're actually in a physical

19  confrontation and you're getting hurt, time seems to drag on

20  and you get exhausted quick because your adrenaline is rushing

21  at the same time.

22  Q.    You were physically tired from the struggle?

23  A.    Yes.

24  Q.    Would you characterize it as a violent struggle on the

25  part of the defendant?

26  A.    Yes.

27  Q.    Did you see the defendant at some point go to the

28  ground?

1    A.    Yes, I did.

2    Q.    And how did he go to the ground?

3    A.    He went to the ground on his hands and knees forward.

4    Q.    When the defendant went to the ground, what, if

5    anything, did you do?

6    A.    I -- since I was getting pushed forward, I remember I

7    ended up -- somehow sat on the ground and got up immediately

8    so he wouldn't pin me down and got -- stood off to the side of

9    the defendant.

10   Q.    Okay.  Did you then make any effort to restrain the

11   defendant?

12   A.    Yes.  We continued to tell him that -- to not fight,

13   that he was under arrest.  And he continued to not produce his

14   arms so we can handcuff him, so I stood off to the side and

15   sprawled on him.

16   Q.    What's sprawling?

17   A.    Sprawling is when you leap onto somebody's back with

18   your hands to try to push them down on the ground.

19   Q.    And were your efforts fruitful?

20   A.    Yes.

21   Q.    What were you able to accomplish?

22   A.    We -- between Officer Rhoden controlling his legs and me

23   sprawling on Defendant Ha, he was off balance and he was no

24   longer on his hands and knees.  His arms were now pinned

25   underneath his chest and his legs were laying flat on the

26   ground while kicking Officer Rhoden.

27   Q.    And did anyone continue to tell defendant to stop

28   fighting or that he was under arrest?

1   A.   It was continuous.

2   Q.   Throughout the whole event?

3   A.   Yes.

4   Q.   Did you make an effort to get control of the defendant's

5   arms from under his body?

6   A.   Yes, I did.

7   Q.   And what did you do?

8   A.   I tried pulling on his upper arm to try to pull it out

9   and keep telling him, "Don't make it hard.  Just give it to

10  me.  Hand it to me," but he continued to tuck it underneath

11  his body and refused to let go.

12  Q.   So what happened next?

13  A.   I saw that Officer Rhoden had gotten his right -- the

14  defendant's right arm in control and handcuffed that side, and

15  so I applied pressure to the defendant's left shoulder blade

16  to gain compliance to try to get the arm out from underneath

17  him.

18  Q.   Was that effective?

19  A.   That was effective.

20  Q.   And what was defendant doing during all this time?

21  A.   He was struggling and kicking his legs and trying to

22  lock up his arms so we weren't able to cuff him.

23  Q.   Was Officer Rhoden ultimately able to handcuff the

24  defendant?

25  A.   Yes.

26  Q.   Up until the time the defendant handcuffed -- or was

27  handcuffed by Officer Rhoden, had the defendant ever stopped

28  his struggle?

DEANNA HILL, CSR #8765

1   A.   No.

2   Q.   Had he ever complied with any of your commands?

3   A.   No, he did not.

4   Q.   After the defendant was handcuffed, did anyone attempt

5   to search the defendant?

6   A.   Yes, we did.

7   Q.   And who tried?

8   A.   Officer Rhoden did.

9   Q.   Was he successful?

10  A.   No, he was not.

11  Q.   Why not?

12  A.   The defendant kept shaking and trying to stand up and

13  refused to be searched.

14  Q.   Were you -- withdraw that, please.

15       Up until the point defendant was arrested, did you know

16  anything about Mr. Ha other than what you had observed at the

17  scene and the resistance you observed and the struggle you'd

18  had with him?

19  A.   No.

20  Q.   Had he ever volunteered to you any information?

21  A.   No.

22  Q.   Had he ever told you where he was coming from?

23  A.   No.

24  Q.   Did he ever tell you where he was going?

25  A.   No.

26  Q.   Ever told you what he did for a living?

27  A.   No.

28  Q.   If he was a student?

DEANNA HILL, CSR #8765

72

```
 1  A.    No.

 2  Q.    Name?

 3  A.    No.

 4  Q.    So nothing at all?

 5  A.    No.

 6  Q.    So all you knew of Mr. Ha was what you physically had

 7  observed with your own eyes --

 8  A.    Yes.

 9  Q.    -- and what you had heard with your two ears?

10  A.    Yes.

11  Q.    Did you ever ascertain Mr. Ha's name?

12  A.    At the end, after the struggle.

13  Q.    When did that happen?

14  A.    After he was handcuffed and when the other officers

15  arrived.

16  Q.    And did you ever ascertain any identification that he

17  may have had in his possession?

18  A.    I asked for it.

19  Q.    Did you find any identification?

20  A.    Eventually found some kind of identification.  I think

21  it was a credit card or something.

22  Q.    And was it in the name of Hung Ha?

23  A.    Yes.

24  Q.    And where did you find it?

25  A.    In one of his pockets.

26  Q.    Pockets of his pants, his jacket?

27  A.    His jacket.

28  Q.    Do you remember what Mr. Ha was wearing?
```

exh 6  rep  tr  p 73 - p 101 (there is a p.82.5 due to error)

73

COPY

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

BEFORE THE HONORABLE WINTON McKIBBEN, JUDGE

DEPARTMENT NO. 103

FILED
ALAMEDA COUNTY

MAY 0 6 2002

CLERK OF THE SUPERIOR COURT

_____
Deputy

THE PEOPLE OF THE STATE OF            No. 166802
CALIFORNIA,

            Plaintiff,

            Vs.

HUNG HA,

            Defendant.
_____/

### REPORTER'S TRANSCRIPT OF PROCEEDINGS
### JURY TRIAL

WILEY W. MANUEL COURTHOUSE
OAKLAND, CALIFORNIA

WEDNESDAY, JANUARY 2, 2002

APPEARANCES:

For the People:              ANDREW ROSS
                             Deputy District Attorney

For the Defendant:           HUNG HA
                             In Propria Persona

**000199**

DEANNA HILL, CSR #8765        Exh. 6

74

I N D E X


W I T N E S S E S

FOR THE PEOPLE:                        DIR    CRO    RED    REC    VD

-- None offered --




FOR THE DEFENDANT:

HUNG HA                          26     101



E X H I B I T S

FOR THE PEOPLE:                              IDENT.      IN EVID.

Exhibit 1                                                  12

Exhibit 2                                                  12

Exhibit 5-A - 5-B                                          12

Exhibit 7                                                  12

Exhibit 8                                                  12

Exhibit 9                                                  12

Exhibit 10                                     1           12


FOR THE DEFENDANT:

Exhibit B                                     30

Exhibit C                                     32

Exhibits D-1 - D-3                            36

Exhibit E                                     39

Exhibits F-1 - F-3                            40

75

```
1    this false charge of lodging.  So this is one important
2    evidence that I have about the false charge.
3                  THE COURT:  I can't admit it, Mr. Ha.
4                  MR. HA:  Okay.  I abide by the Court's ruling,
5    although I think it's erroneous.
6                  THE COURT:  You can testify, as I said before.
7                  Anything else, Mr. Ross?
8                  MR. ROSS:  I don't know.
9                  THE COURT:  Now, do you have other items that you
10   plan to introduce?
11                 MR. HA:  No.  That's about it.  That's about it at
12   this point.
13                 THE COURT:  All right.  Then we'll see you at 2:00
14   o'clock.
15                 MR. ROSS:  Thank you, your Honor.
16                 THE COURT:  All right.
17                 (Recess taken.)
18                 THE COURT:  Good afternoon, ladies and gentlemen.
19                 THE JURY:  (In unison) Good afternoon.
20                 THE COURT:  All of the jurors are present as is
21   Mr. Ha and Mr. Ross.
22                 So we'll resume, Mr. Ha, with your testimony.
23                 MR. HA:  Okay.  Let me start again.  Before we had
24   the lunch recess I was telling the court that on the second
25   floor of Dwinelle Hall I put down my belongings on the bench
26   and sat down to finish the remaining food.
27                 Question:  What do you possess or what do you have
28   with you at the time that you were there at those moments?
```

1          Answer:   I had a backpack.   In the backpack there is
2   a green binder.   That binder contains a stack of paper.   They
3   are filled with paper.   There are paper with the notes that
4   have to do with my personal project, and at the end of that
5   binder there was a number of pages about bibliography on
6   several subject.   I remember there were four subject.   One of
7   them is about China, and the other one is about slavery, the
8   other one about prostitution, and the other one is about
9   native people of this land.   So there was some research and
10  those books are available in the main reference room in the
11  main library of the university.   And besides that green binder
12  there is a notebook and it's full of my records.   There are
13  other things in the backpack which are not very important, so
14  let me skip that.

15          And I had a shoulder bag.   It's a shoulder -- it's
16  made of cotton.   In it there are numerous personal items.
17  There was one towel issued by the gym.   There were two jacket:
18  one leather jacket with a white electronic clock in its left
19  side pocket, and there was a 100 percent cotton jacket, long
20  sleeves.   In its inside pocket there is one document which
21  also serve as my personal identification.   It was current.   It
22  shows that I was a member of the university.   It was a
23  document generated by the Housing Office of the university
24  dated March the 2nd, just a couple days ago.   There were other
25  miscellaneous items.   There was a plastic container which
26  contains the food.

27          MR. ROSS:   Your Honor, I hate to interrupt and it's
28  a long answer, but I need to object and ask to have stricken

1    the portion of the answer relating to document, what the

2    document stated, as it's already been ruled as inadmissible.

3          THE COURT:  You don't have to recite everything that

4    there was.  You introduced the items, haven't you, here?

5          MR. HA:  Yeah.

6          THE COURT:  Okay.  You don't need to recite them

7    all.

8          MR. HA:  Okay.  Okay.  So I had -- okay.  What do

9    you have on the bench specifically?

10         Answer:  I had on the bench the backpack, the

11   shoulder bag, the upper cover of my raincoat, and that's about

12   it.  I was wearing three pants with the raincoat pants on the

13   outside.  I still wearing that pant although I was in the

14   building and, of course, no rain was coming in the building.

15   And I was wearing a shirt, a sleeveless vest or sleeveless

16   jacket which is made of 100 percent feather.

17         Why is that important?

18         It will become apparent later on.

19         And let me mention one tiny piece of evidence.  My

20   raincoat pant has -- is little bit unusual.  It has in back

21   kind of a -- it goes up to my back.  So there's piece of it

22   that goes up to my back.  Actually, I was actually wearing

23   three pieces of something on my torso.

24         Okay.  So let me go on.

25         Question:  So what do you do when you sit down

26   there?

27         Answer:  I pull out the food out of the plastic

28   container and start eating.  So when I was starting eating, I

1   was -- I got up and I walked.  I pace along the length of the
2   hallway just between the recess of the wall on one side and
3   the exit door and Room 203 on the others.  I was not walking
4   in a circle.  I was pacing.

5           Question:  Why are you pacing there?  Why didn't you
6   sit down in the recess?

7           Answer:  I placed myself in plain view.  That's the
8   purpose, because you never know.  There are surveillance
9   cameras everywhere.  People are suspicious.  People with
10  authority can accuse you of something on the basis, some
11  evidence which can be distorted pretty much out of proportion,
12  whether in bad faith or not.  I was cautious, so I would place
13  myself in plain view.  I was not in recess.  If I was in
14  recess, then nobody could see me.  Then I would cause
15  suspicious.  Nor was I in any classrooms, because if I was in
16  a classroom, somebody came over and could accuse me of
17  something.  So I was not in the classroom.  I walk where I
18  could be plainly seen by everybody.  So if anyone try to
19  accuse me of anything, I would be able to defend myself more
20  easily.

21          Question:  Why are you so cautious?

22          Answer:  I was not -- I was not inexperienced
23  person.  I had lots of experience.  By the time I was 46 years
24  old I had gone through a lot of experience.  I have been
25  falsely accused of wrongdoing many times before.  I suffered
26  quite a bit, so I was cautious.  I was particular cautious
27  because something that happened shortly before that time,
28  shortly before March the 4th.  There was one event which makes

1    me extremely cautious.

2         MR. ROSS:  Your Honor, I'd object at this time.  I'd

3    ask that if we're going to discuss some prior event that

4    Mr. Ha is now attempting to have admitted, I'd ask that we do

5    it out of the presence of the jury initially.

6         THE COURT:  I think you better skip that for the

7    time being, Mr. Ha, and go on to something.

8         MR. HA:  Yeah.  I just about stop at that point.

9    I'm not going to get into details unless the Court wants more,

10   unless Mr. Ross wants to know.

11        And maybe I could be permitted to mention the fact

12   that in my wallet there's a piece of jade.  I had that jade

13   with me because I was worrying about danger against my

14   personal safety which is beyond my ability to control and

15   prevent and I wear that piece of jade in order that it would

16   protect me against danger which is a person's normal ability

17   could not protect against.

18        I'm Chinese.  That's why the Chinese wear jade for,

19   to protect that person's safety against danger which their

20   personal ability cannot prevent them against.  So I have a

21   piece of jade.  And I believe prosecutor does not dispute that

22   fact.

23        MR. ROSS:  Your Honor, I'd ask that the Court

24   admonish the witness to testify only to answers given to

25   questions.

26        MR. HA:  Excuse me.  Let me respond, your Honor.  It

27   has to do with my state of mind at the time.  It's very

28   important.

80

```
 1          THE COURT:  You may proceed.  Make it as brief as
 2   you can.

 3          MR. HA:  I already cover that point.

 4          Your Honor, may I put on the raincoat pants to help
 5   me demonstrate what happened?

 6          THE COURT:  All right.

 7          MR. HA:  That's not the pants.  This pants turns out
 8   to be quite important.  So I'm going to put on.  Oops.  Sorry.

 9          May I draw a chart?

10          THE COURT:  All right.

11          MR. HA:  So I'm going to draw a chart of the event
12   and the scene where this event took place on March the 4th.
13   Let's suppose that's the wall on the north side.  Okay.
14   Forget about this part.  Here's the recess of the wall.
15   Here's the end of the south -- southeast end of the hallway.
16   That's the recess and there's the bench here.  There's the
17   window here, window here.  That's exit, exit door.  Actually,
18   it could be used as entrance door, although it says that exit.
19   Here's door of Room 203.

20          This is where defendant was sitting.  He came up
21   here.  He's pacing along the wall, pacing this way, while
22   eating.  That's what he's doing.  This is the hallway.  So
23   he's in plain view.  He's wearing this pant.

24          Question:  What is your attitude about -- towards
25   local police as of that time?

26          Answer:  My impression about the police is very
27   unfavorable to them.  I have personal -- direct personal
28   experience with them numerous times and my evaluation of local
```

DEANNA HILL, CSR #8765

1   police, such as U.C.P.D. and Police Department of Berkeley,

2   Police Department of Oakland, Police Department of

3   San Francisco is extremely unfavorable.

4          There was particularly one incident that occurred

5   just several weeks before.  If I may give a brief description

6   of it, I will do so.

7          MR. ROSS:  Your Honor, again, I'd make the same

8   earlier objection that if this is any evidence of a prior

9   involvement with police that Mr. Ha is seeking to introduce,

10  that it would be proper for a motion out of the presence of

11  the jury.

12         THE COURT:  I think you ought to forget that for the

13  time being.

14         MR. HA:  Okay.  Yeah.

15         So let me say that in general my opinions about

16  police was very unfavorable to them based on my direct

17  personal experience and observation.

18         So while I was eating there for some minutes, maybe

19  more than five minutes -- let me ask the question first.  When

20  do you see Officer Rhoden or the first officer who appear on

21  the floor?

22         It was after I was eating there, pacing there for

23  about five minutes or more.  Then I saw a police officer

24  emerge from the other end of the hallway.  That's the

25  southwest end.  I was in southeast end.  Southwest end this

26  end.

27         He came out from a staircase which is directly --

28  which is virtually identical with the stairwell where I was.

82

1    And both the stairwell terminates on that floor.  They do not
2    go up to the third floor as I found out.  So he apparently has
3    to come up from the first floor or D level.

4              Question:  What happens -- between the moment that
5    you saw officer appear at the other end of the hallway to the
6    time you were handcuffed, what happened?

7              MR. ROSS:  Your Honor, I object to that as vague.

8              MR. HA:  I ask the Court to give me a narrative
9    response.

10             THE COURT:  Let him finish.

11             MR. HA:  I think the jury needs to know the whole
12   picture in a coherent way.

13             MR. ROSS:  I object to the discussion Mr. Ha is
14   trying to have --

15             THE COURT:  Don't argue.  Just answer your question.

16             MR. HA:  I saw an officer.  I did not require that
17   he be close in order to know that he was an officer.  I knew
18   that he was an officer when I first saw him because of the way
19   that they were dressed.  He walk along the hallway coming
20   down, although I did not know whether he would come all the
21   way over.  He walked slowly and he stretch out his hand to
22   touch the wall as he walked from now and then.  And if there
23   was a door open, he take a look at that.  His motion was slow,
24   sluggish.  He was not in a hurry.

25             As I saw him coming, I did not want to embarrass
26   him.  I anticipate that there would be a problem if he came
27   too close to me because he will be compelled by embarrassment
28   to speak to me and who knows what will happen.

P.82.5

1    So I stopped pacing along the length of the
2  sidewalk -- I mean the hallway.  Let me just get up and
3  demonstrate what happened.  There's a hallway here across the
4  building.  Connecting this south wing to the rest of the
5  building there's a hallway.  So I was hoping that he will turn
6  this way.  So when I saw him, I stop pacing.  I came into
7  here.  Either I sat down or on my feet.  I don't exactly
8  remember.  But when I was here, I could not see him.  He could
9  not see me either.  To see me, he would have come very close,
10 to about 15 yards, to see me in this area.

11    Anyway, let me go on.  I stay here, continue eating.
12 After a few moments, maybe one minute, I went out to about
13 middle of the hallway and eating.  I start pacing this way and
14 I saw him there again.  He did not turn in this way.  He did
15 not turn.

16    MR. ROSS:  Your Honor, again, I'd object to the
17 narrative.  I need question and answer which is appropriate
18 for courtroom decorum.

19    MR. HA:  Your Honor, narrative response is one of
20 the four permissible causes of response.  If it's appropriate,
21 it can be allowed.

22    THE COURT:  Make your answer more brief to the
23 questions.

24    MR. HA:  Yes.  All I'm trying to describe is just a
25 few minutes event.  I will give that in narrative form.

26    So I saw him coming back this way.  I kind of
27 worried about what would happen if he came too close.  I
28 continued to walk.  I perhaps stopped here for a second time.

1   I don't exactly remember with perfect clarity, but I think I
2   stop here for some time and hoping that he would turn away or
3   whatever.  I kind of worry.  I did not know what will happen
4   and worry about that.

5           After some time I came into this here again eating.
6   He already had gone substantially past this hallway, this
7   cross hallway, this connecting hallway.  He was close to 205.
8   I continue.  He was approximately before 205.  I came back
9   here and he said to me, "How are you doing?" something like
10  that.

11          I said, "Hi, Officer."  I was very cold.  My
12  attitude toward him was pretty cold because based on my
13  experience.  I say, "Hi, Officer."  I did not say any further.
14  I just took one step or something.

15          He said, after pause, "Are you a student?"

16          I stopped here.  I stopped when he asked me.  I
17  pause and then I say, "Yes."

18          He said, "Do you have I.D. with you?"

19          I understood his question to mean the I.D. of a
20  registered student.  I stop for one minute and I say, "Yes."

21          So he wants me to show my I.D.  I think he ask, "Do
22  you have" -- okay.  He asked me, "Do you have -- are you a
23  student here?"

24          I say, "Yes."

25          He said, "Do you have I.D."?

26          I say, "I have my I.D. with me but I will not show
27  that."  Then he asked for my name.  I say, "I cannot tell you"
28  or something like that or -- okay.

1    MR. ROSS: Your Honor, again, I have to object to
2    this narrative.
3    THE COURT: I think we'll get through quicker if he
4    goes ahead and finishes.
5    MR. HA: I remember everything clear except the
6    order. Perhaps a little bit out of the order.
7    I ask -- he continues to ask for my personal
8    information. I ask him, "Officer, what's wrong with me?"
9    Okay. He says somebody had -- he said in a quite articulate
10   way that somebody had reported seeing a suspicious person
11   eating at the end of a hallway. He actually expressed that
12   better than I just did. I said, "Officer, there's nothing
13   wrong with my eating here." I say two things at that time.
14   MR. ROSS: Your Honor, I'm going to also object to
15   the self-serving admissions or hearsay statements.
16   THE COURT: Don't repeat what was said anymore. Go
17   ahead and finish.
18   MR. HA: I said to him that, "You have failed to
19   state a set of facts about my wrongdoing for which you could
20   demand to see my I.D. I know that" -- okay. That's what I
21   said. And I said that there was nothing wrong with my eating
22   here. And I said that -- okay.
23   MR. ROSS: Your Honor, I'm going to continue to
24   object to the hearsay that's being offered by Mr. Ha.
25   THE COURT: I think we'll get through it quicker.
26   MR. ROSS: Hearsay is inadmissible.
27   THE COURT: Your objection is noted in the record.
28   Proceed, Mr. Ha.

1        MR. HA:  Mr. Ross disrupt me.  I remember things

2  well except the order in which those things occur.  I'm going

3  to sit down.

4        I said to him that, "Officer, if you don't like me

5  being here, I could leave."  He said trespass, the other

6  trespass.  I said that the building was open.  There were

7  students downstairs practicing dance and the lab down the

8  hallway was open, but he ignored what I was saying.  Again, I

9  told him -- I said to him again that he failed to state a set

10  of fact about my wrongdoing for which he could demand to see

11  my I.D.

12        He continued to ask me to disclose my name and show

13  him the I.D.  I refuse.  I said -- after he said -- after the

14  word "trespass," I also said, "Officer, if you don't like me

15  being here, I could leave."  He did not directly respond to

16  that remark.

17        He said that he was detaining me.  I said it was a

18  illegal detention in violation of my constitutional rights.

19  He did not directly respond to that remark.  I said to him --

20  I request to him -- I said to him, "Call up your supervisor.

21  I would like to speak to him."  He did speak to his radio

22  communication using his radio communication device.  I assumed

23  that he was contacting his supervisor and I remain silent for

24  a moment after I had said that and watching him trying to

25  contact somebody.

26        And he -- after he had make the radio broadcast,

27  whatever it's called, he said to me, "Sit down."  I sat down

28  on the bench at the end of the bench on the other side.  I

86

1   continued eating.  Officer Rhoden took away my bowl.  I said

2   to him, "This eating utensil is not a weapon."  I did not say

3   that it was a plastic knife.  I used the word "eating

4   utensil."  He said it's a plastic knife.  And he took my bowl

5   with plastic container and apparently put it on the other end

6   of the bench.

7        Then he came before me.  He placed himself within

8   four feet of me so that the nearest part of him was within two

9   feet of me and he raised his right hand with his index finger

10  extended fully.  He raised his right hand index finger at my

11  nose about two inches away.  At one point he said -- I believe

12  that he said, "So" -- at the time that he was pointing at me

13  he said, "So you're a lawyer student?"  I did not respond to

14  that.  I said, "Put your finger away."  I said that pretty

15  firmly, although my voice was not harsh, was kind of low

16  voice.  I did tell him very firmly, "Put your finger away,"

17  and he did put his finger away.

18       I ask him again to contact his supervisor.  I said,

19  "Call up your supervisor."  Apparently he did speak to the

20  radio communication mouthpiece.

21       After he had done that or about finished doing that

22  I said that, "You have a gun.  There's no witness."  And after

23  a momentary pause I said, "You are a big guy."  He was very

24  close to me, just within -- actually, within two feet or two

25  feet away from me.  He pulled down his jacket over the gun to

26  cover it.  He did not say any -- I don't think he say

27  anything -- he did not say anything.  He pulled down the end

28  of the jacket over the gun.  I could still see the gun before

1   my nose.  He's virtually before my nose.  After he was doing
2   that I also heard the creaking of that belt, the leather belt
3   or something.  Perhaps it was made of real leather.  And so we
4   were waiting for -- from my point of view for the sergeant to
5   appear.

6          There was not much spoken between him and me.  He
7   was quiet man.  He appears to be not an articulate person,
8   although at first he seems to be articulate.  I had nothing to
9   say.  I was waiting for the supervisor to appear.

10          After some moments he was looking over me through
11  the window blind.  He look out the window and say somebody was
12  coming, an officer was coming.  My understanding -- my
13  suspicions became bigger.  I suspect that he has somebody come
14  up here to -- I forgot one thing.  Let me finish this and then
15  go back.  My suspicion grow as he said there was somebody --
16  an officer coming, but he did not say that what he was -- what
17  he saw was his supervisor.

18          So I said to him that, "If you are to arrest me, you
19  will be in big trouble."

20          And he said, "Are you threatening me?"

21          I said, "There will be legal consequences."

22          Okay.  What I forgot is this:  While we were waiting
23  for the sergeant and while he was actually waiting for
24  Officer Collom, I asked him, "Are you going to arrest me?"

25          He said that he have not decided.  He might or might
26  not.  That's exactly what he said, although not exactly
27  perhaps.  I omit one or two words, but that's exactly what he
28  said.

1           I said to him --

2         MR. ROSS:  I have to make an objection again, your

3 Honor.

4         MR. HA:  That's not fair.

5         MR. ROSS:  Excuse me, sir.  The objection is not

6 only to the narrative, which I understand you've noted my

7 objection, but the continued nonstop admission of all this

8 inadmissible hearsay.  I have to continue to object to it.

9         THE COURT:  All right.  It's noted.  Go ahead.

10         MR. HA:  Okay.  I said to him, "If you arrest me,

11 you will be arrested for felony assault and battery with a

12 deadly weapon."  I deliberately did not say I will arrest him.

13 I did not say that.  But what I had in mind is I will make

14 citizen arrest of him if he did what I thought he was going to

15 do.

16         And let me go back to my earlier testimony moments

17 ago.  When he said that he saw an officer without mentioning

18 supervisor, my suspicion grow.  I have a more genuine sense

19 that he was going to have somebody to come up to beat me up,

20 to arrest me.  After my second or third time warning to him

21 about felonies that I suspect that he was doing, so we were

22 again silent waiting for those people or supervisor to appear.

23 It was very quick.  I was surprised when Officer Collom appear

24 through the exit door.  I have those photographs admitted as

25 exhibit, although not yet as evidence.

26         As you might recall of the photograph, that chart

27 shows that in front where I was there was an exit door.

28 Officer Collom came up to D -- the E level or the second floor

1   through that exit door and he faced me directly.

2         And let me show you this. I was sitting here.

3   Officer Collom came up from this stairs and enter here.

4   That's where he enter. He came up to here. That's where he

5   came up, approximately here. There's a fire alarm elevation

6   device here. He came up here. He was there. I was here.

7   Officer Rhoden was here in front of me. I was about here.

8   This distance would be just several feet, three to five feet.

9   He came to here. He spoke to me in Cantonese and I realized

10  at once he was from Hong Kong as I was. He said to me in

11  Cantonese, "Do you have I.D.?" That's my translation.

12         I said, "I cannot show you."

13         He asked me in Cantonese, "What is your name?"

14         I said, "I cannot tell you."

15         Then he speak in English. If I remember correctly,

16  he spoke in English. He said something like, "If I don't know

17  your name, how do I call you?" I was silent. And he said,

18  "How about" -- something like that. He said, "How about John,

19  James, Jonathan?" I was a little bit surprised because he

20  used the name James and I actually had used that name. I was

21  silent. He said, "How about John Doe?" John Doe is a legal

22  way to call somebody.

23         I said, "Okay."

24         And he asked me again about my I.D., not about my

25  name, about my I.D. I say -- I asked him again -- I believe I

26  asked him what was wrong with me. Okay. And he said that I

27  committed trespass. That's exactly what he said. Although he

28  may not use the word "committed," but his expression was very

1   brief, clearly indicating trespass.

2          I said to him there was no trespass because of the

3   building is open, because there are people dancing there

4   downstairs, and because the lab was open at the end of the

5   hallway.  He perhaps did not understand me fully.

6          Then he said -- okay.  I remember everything clearly

7   except the order.  He said that I refused to cooperate.

8   That's exactly what he said among things that he said.

9          I said that he had failed to state the facts about

10  my wrongdoing for which he could demand to see my -- make his

11  demand or words to that effect.  Okay.  He said in English

12  that I was obstructing.  Okay.  At that point -- as soon as he

13  start, I already started.  I said, "This is simply confusing."

un convincing (*)

14  I did say this.  And he was angered.  It appeared to me that

15  he was angered because he could not articulate a set of

16  concrete facts about my wrongdoing.  He was angered at that

17  point and he stopped at the sentence of obstructing.  He did

18  not say obstructing or anything or adjusting whatever.

19          I was looking at him.  I was sitting here facing

20  him, my hands on the bench, so watching him, kind of looking

21  up at him.  I saw him exchange a look with Officer Rhoden and

22  both utter the word 184 (sic), Section 184.  I did not

23  remember the number at the time.  I was aware that he

24  uttered -- both of them say "four."  That's what I remember

25  subsequently.

26          Okay.  As long as -- I heard both of them utter

27  Section 148.  Officer Collom came towards me.  He step close.

28  He grabbed my left hand by the wrist and then start to pull

1   up.  He was not pulling me hard.  I admit he did not pull me
2   hard.  I rose with him so I don't get twisted.  And
3   Officer Rhoden, I did not look at him.  I was looking at him.
4   I felt that somebody just stoop over, like stooping over, but
5   what I know for sure is that Officer Rhoden took my left hand
6   wrist with his right hand first and Officer Collom release my
7   wrist and led him to me.  I did not do anything.  I just
8   lifted my hand like that.

9            THE CLERK:  Sir, that has to stay on my exhibit.

10           MR. HA:  Oh, I'm sorry.  I thought it was -- then
11  Officer Rhoden was all over me.  He moved in this direction.
12  That's where I am.  Then he comes up this way.  I was up with
13  my left hand rest behind me just like this in a wristlock.  I
14  was away from this place.  And Collom, Officer Collom,          5
15  switched to my back.  Okay?  So at that time they both were
16  just wild.  All of a sudden they were just wild.  I can't
17  describe it.  They were just wild.

18           I was being spun.  I move this way.  We are going
19  up.  This is not proportioned.  I was spun being here.
20  Here -- about here stop.  At here I looked up to my -- this
21  side.  That's the end of the walk.  I look up and I saw
22  Officer Collom here.  Apparently he got pinned down there.
23  And Rhoden had his right hand over my neck, over my throat.
24  That's how he spun me around.  And then I continued to be
25  spun.  They swung me around.  Officer Collom was chasing after
26  me.  He was hitting me.  So I had fitted vest with me and all
27  of this together to block his punch.  It's sort of like -- his
28  punch were sort of like raindrops falling on duck's feather,

1    so I was unhurt.

2            When I was about here, I said, "I will cooperate

3    with you."  Okay.  It was about here.  I said, "I will

4    cooperate with you."  And Collom was still here.  He said,

5    "It's too late."  That's what he said.  Officer Collom was

6    completely silent throughout this whole event.

7            When I was about right here, I fell down.  I fell

8    down on my left knee like this.  Let me demonstrate.  That's

9    where I fell down, with my left wrist here and my right hand

10   had support myself.  This is a critical movement.
                                              moment

11   Officer Rhoden did not release his right arm over my neck.  He

12   throw his weight over me.  That's 240 pounds plus force of his

13   momentum.  He smash me first here.  So I fell down.  I felt

14   all the body were over me.  I was terrified here.

15           At this point I was just terrified to the extreme

16   human experience.  There's some good reason why.  That's where

17   I defecate uncontrollably.  I just felt those feces coming out

18   of my intestines.  It's like a mud slide or something.  As you

19   remember earlier in my testimony, I said I went to law school

20   to use the men's room for relief.  I didn't think I would have

21   a relief here.  Everything empty out of my intestine.

22           Here I face an important question, whether I should

23   fight back or let them do whatever they want.  I know the

24   consequence.  They were doing what they want.  I will be

25   begging for their mercy.  I have two options, fight back or

26   beg for their mercy.  It's very humiliating, extraordinarily

27   humiliating.  That's why this clothes is very important.

28           At that time I knew that Rhoden does not know

93

1   martial art at all.  I could beat him.  Collom does not know

2   martial art at all.  I could beat him.  I could beat them both

3   at the same time.  Even though there were two of them I could

4   beat them.  But I had this thing.  I cannot kick.  It's not

5   possible.  It's limit your movement.  You could not kick.  I

6   knew this thing.  With the lid down, I could not fight them.

7   I'm a pretty good martial artist.  I could not attack them.

8   And it's important that at this point I not provoke them.  If

9   I provoke them, I could not know what is going to happen.

10  They're going to torture me and I'm going to beg them for

11  mercy.  It will be very humiliating.  There's no witness.

12  Nobody is going to stop them.  So because I had this pant with

13  me, I had to put up with that.

14          So they pull me up.  They pull me up.

15  Officer Rhoden pull me up.  Then -- this is out of proportion,

16  but basically that's what it is.  I would be about right here

17  when I fell down.  First got smashed first.  They spun me

18  around again going here and I was smashed down.  This time I

19  was down very hard.

20          And Collom, Officer Collom, while he was punching

21  me, he was also assisting Officer Rhoden to smash me and

22  that's why my shirt was torn open, my vest was torn open.  I

23  was smashed hard.  I fell on my left side and my left forehead

24  hit the ground and Officer Rhoden throw his weight over me.

25  That's 240 pounds plus momentum and it was terrible.

26          They again -- Rhoden again did not release his leg

27  from my throat.  He again pull me up.  I could hardly breath.

28  But it was very fortunate that he did not know the Judo choke

94

1   hold.  If he know Judo choke hold, I could be dead in two

2   minutes or suffer serious brain damage.  I know that Judo

3   choke hold.

4            They attempt to swung me around.  That's after the

5   second smash.  And Officer Collom got frustrated because his

6   punch behind me was not effective.  I was wearing that

7   leather -- I mean the feather vest plus the shirt and plus

8   this.  He got frustrated.  He was here on my side and I was

9   stooping over here.  I was stooping here to avoid being hit in

10  my face.  I don't want to lose my teeth or my eye.  So I try

11  to stoop over so he could not hit my face.  He hit my --

12  because I was in that position, he kick my chest with his left

13  knee -- with his right knee.  He kick me once.  I was exposed.

14  He caused the shirt and vest torn open so my body was exposed

15  and he saw his chance and he kicked me with his right knee and

16  then he start punching me on the head, both side of the head.

17  He punch my head.

18           Then here I don't exactly remember what happened

19  because of the smash.  I was a little bit dizzy at that time,

20  so I don't clearly remember.  What I remember clearly is what

21  Collom, Officer Collom, was doing.  That is to say that he hit

22  me with a right knee kick and then punch my head.  He was

23  wild.

24           I had to try to find some way out, so -- as I said,

25  I don't exactly remember the details for a moment that

26  immediately follow that smash.  I begin to sink down to the

27  floor.  Nobody was holding my hand and my hand appears to be

28  flailing because the wild motion by Officer Rhoden.  All I try

1    to do was keep my balance.  That's what I was trying to do.

2    No resisting at all.

3    Okay.  So I put my right hand and he grab my upper

4    arm here.  Officer Rhoden grab my upper arm here.  He was

5    about here.  I sink down to the floor.  So Officer Rhoden

6    right arm release from my -- release my neck or throat and

7    grab my right upper arm, so I begin to sink down.  I sink down

8    on the floor.  Both of them were on my back immediately.  And

9    I was aware that somebody put his -- entirely his body weight

10   over my spine, lower spine.  Anyway, ridiculous.  I did not

11   move at all.  It's just like I were fainted already or had

12   passed out already.  I did not make any movement.  I did not

13   breath heavily.  I was very quiet.

14   Then after a while all of the body was over me.  It

15   was as if I was at the bottom of a human pile.  And they stop

16   doing whatever they were doing over me and I was aware that

17   somebody -- it was Officer Rhoden who put his handcuff to

18   handcuff me.  So I was handcuffed.  I was handcuffed and then

19   I start -- okay.  They are started to pull me up without using

20   a lot of force and then I got up slowly.  I got up slowly.  So

21   I was left standing here for a while.  They were not attacking

22   me at the time after I was handcuffed.  They were just

23   standing around.  And Officer Collom was pacing along this way

24   and he said, "See how strong you are," something like that,

25   although I don't exactly remember his remark.  Officer Rhoden

26   say nothing at all.  He was silent.

27   I stand about here at the middle -- somewhere in the

28   middle of the hallway before the bench.  I said towards

96

1    Collom, I said, "I have my I.D. with me."

2    And Officer Collom was walking this way and he said,

3    "I'm not interested."

4    I said, "I have it in my pocket."

5    He immediately interested. He immediately came over

6    here to my right side, pulled down the zip and took out my

7    brown wallet. And in my brown wallet there are lots of I.D.

8    cards there. Whatever you call it, I.D. card. They are for

9    personal identification purpose.

10    Then he -- Officer Rhoden told Officer Collom --

11    Officer Collom told Officer Rhoden that the photograph was a

12    Recreational Sport Club I.D. card membership card. He told

13    him that while Officer Rhoden was in front of 203. I was

14    here. He left me standing here.

15    After that Officer Rhoden came over and had me sit

16    here. So I came down here and sit here. Officer Rhoden put

17    my cap, the golf ball cap -- that's the kind of cap that

18    people who play golf wear. Officer Rhoden put a cap over my

19    head.

20    So I was sitting here silently, quietly.

21    Officer Collom ask me -- pacing here. He got some information

22    from me about my birthday and my name. They were silent.

23    They're waiting for somebody to come over and I also waiting

24    for the sergeant to come over. And Officer Collom said

25    that -- in Cantonese, "Elder brother Hung, I wish you would

26    have showed me this card before when I ask you." That's what

27    he said. He was walking here. Then we did not speak anything

28    toward one another and the officer, too, as far as I know did

97

1    not speak to one another.  And Officer Mark Rhoden was quiet

2    throughout the entire event.  He did not say one single word.

3    He did not say anything to Officer Collom when he appear.

4    After I was handcuffed they say nothing to each other except

5    he asking Officer Collom what the photo I.D. was, and

6    Officer Collom told him he was using the radio communication

7    device.  I don't know what he was doing.  That's the whole of

8    the event.

9              THE COURT:  That's everything you want to testify

10   to?

11             MR. HA:  That's the core.  I have something else to

12   add I think that's also needed to complete the whole picture.

13             THE COURT:  All right.

14             MR. HA:  So what happened next was -- oh, question:

15   When did Officer Yao appear?

16             Answer:  Officer Yao appear in a very short time, in

17   about one minute after I was sitting.  He came with

18   Officer Devin Kochis.

19             Question:  From which entrance did he appear on the

20   D level -- or E level?  I'm sorry.  On the second floor.

21             Answer:  They appeared in the same entrance as

22   Officer Collom did.  Officer Yao was the first and

23   Officer Kochis was behind him.  Officer Kochis was carrying a

24   black box.

25             Where did Sergeant Yao -- question:  What did --

26   where did Sergeant Yao stand once he arrived at the scene?

27             Answer:  He stood before the end wall of the

28   hallway.  Let me just illustrate that.  Sergeant Yao came

98

1    first -- he came first.  He stood here where the fire alarm

2    device is.  Officer Kochis was here, leaning against the frame

3    of the door.  So he faced me directly and Officer -- I mean

4    Sergeant Yao was here.

5              Question:  What did you say to Sergeant Yao when he

6    appear?

7              The first thing I said to Sergeant Yao was that the

8    handcuff was too tight.

9              Question:  What happened once you said that to

10   Sergeant Yao?

11             Answer:  Sergeant Yao instruct Officer Rhoden to

12   loosen up the handcuff and Officer Rhoden did came up to me to

13   loosen the handcuff a little bit.

14             Question:  What's the next thing you said to

15   Sergeant Yao, if any?

16             Question -- answer:  I said to Sergeant Yao that the

17   officer had attacked me, and my impression is that Sergeant

18   Yao believed me at the time.

19             MR. ROSS:  Objection to the speculation as to what

20   Sergeant Yao believed.  Ask to be stricken.

21             THE COURT:  Yes, sustained.

22             MR. HA:  I believe that -- okay.  Question:  What

23   did Sergeant Yao do after he heard your remark about police

24   attacking you?

25             Answer:  Sergeant Yao immediately instruct

26   Officer Kochis to take picture of my injuries.  I was

27   impressed by that.  Officer Kochis came up for and took

28   picture of my injury so that several pictures were taken of my

DEANNA HILL, CSR #8765

1  injury at the time.

2         Question:  What was the next?  What you do upon

3  Sergeant Yao's arrival?

4         Answer:  Having said those things, I declared

5  citizen arrest of Mark Rhoden and Collom.  I turned to them on

6  my right side.  They were in front of Room 203.  I said --

7  then I said that I was arresting them under Penal Code Section

8  849 for felony assault and battery with a deadly weapon.  Then

9  I -- they did not make a response to my remark.  I immediately

10 turn to Sergeant Yao and said, "I would like to ask you to

11 take them into custody."

12        Question:  What did Sergeant Yao respond?  How did

13 Sergeant Yao respond to your request?

14        Answer:  Sergeant Yao said, "I'm not going to do

15 that."  That's exactly what he said.

16        Question:  What did you do once he refuse?

17        Answer:  I realized that he was the sergeant.  If he

18 did not do anything, then that was about it.  But I turned to

19 Officer Kochis.  Officer Kochis was with me leaning on the

20 post of a door frame.  I said -- I said I was not a suspect,

21 something like that.  I said the officer had attacked me.  I

22 saw that his face was full of indifference, so I did not

23 complete the rest of that and I did not cite Penal Code

24 Section 839 and another couple relevant section in the Penal

25 Code.  There were two more relevant section in the Penal Code

26 about officers refusal to take arrestees into custody.  So I

27 did not finish that seeing Kochis' face, his expression.

28        I told -- let me just go back.  When Sergeant Yao

1    instruct Officer Kochis to take pictures of my injury, I
2    mention to them that -- I mention to them that I have
3    defecated in my pants so that my knees was dirty.  That's why
4    they did not try to take the picture of my left knee.

5              And about that time Officer Rhoden put on the gloves
6    made out of some kind of material and he and -- as far as I
7    was aware, after Sergeant Yao had refused to take them into
8    custody, they began searching my belongings on the bench.
9    They start pulling things out of it and look into it.  So I --
10   my attention was mostly with Sergeant Yao at the time.

11             And my conversation with Sergeant Yao continue after
12   that.  Sergeant Yao has said that I could file a citizen
13   complaint.  I said, "I'm not going to do that."  So I admit
14   that.  I said to Sergeant Yao, "I'm not going to do that
15   because" -- although I did not explain why, but I understand
16   the citizen complaint procedure is fraudulent.  It's not
17   something really -- for public image rather than actual
18   sincere intent to discipline themselves.

19             And Sergeant Yao and I also had a brief discussion
20   about what I was being charged for.

21             MR. ROSS:  Your Honor, at this time I make a further
22   objection to all of this hearsay testimony.

23             THE COURT:  I think we've covered the subject
24   matter.  What happened subsequently really isn't relevant to
25   the issues here.

26             MR. HA:  They're not really important, but they're
27   kind of useful as to what happened.  They are just useful to
28   complete the full picture, although they are not essential.

101

1        THE COURT:  But the jury isn't concerned about that.

2   Their only interest is in the prior conduct that took place.

3   So I think that covers it.  If there's anything else that you

4   want to cover with respect to the event itself, not

5   subsequently to it.

6        MR. HA:  That's about the event.

7        THE COURT: All right.  Well, we'll take a recess so

8   you can catch your breath.

9        MR. HA:  Okay.

10       THE COURT:  We'll take a recess for fifteen minutes,

11  ladies and gentlemen.  Please keep in mind the admonitions

12  given to you before.  You're not to form an opinion about the

13  case.  You're not to discuss it amongst yourselves nor are you

14  to discuss it with anyone else.  And if anyone attempts to

15  discuss the case with you in any way, please advise the Court

16  of that fact.  Return in 15 minutes, please.

17            (Recess taken.)

18       THE COURT:  All of the jurors are present and then

19  both Mr. Ha and Mr. Ross.

20       So you may cross-examine, Mr. Ross.

21       MR. ROSS:  I think Mr. Ha -- I thought he wasn't

22  finished.

23       MR. HA:  Your Honor, may I introduce -- attempt to

24  introduce some exhibits?

25       THE COURT:  All right.  What are they?

26       MR. HA:  I have -- Mr. Ross, would you like to take

27  a look at them or raise any objections?  I have two, four --

28  about nine.  Do you want to stipulate?

.exh 7   p 102

ANDREW ROSS'S CLOSING ARGUMENT

102

1    And what has he told you throughout all of this?
2    Since March of last year he's gone about his regular business
3    at the University of California, Berkeley. He's got his
4    favorite offices there. He's got to use the library for his
5    special secret projects. He's got to go to R.S.F. every day.
6    He is a member of the University of California, Berkeley
7    community. Cal is his home. No law is going to stop him from
8    going there. No officer is going to keep him from standing
9    there. No judge's order is going to keep him from going in
10   those buildings. That's the defendant in this case, that's
11   the man who committed these crimes, and that's the man who's
12   guilty as charged. Thank you.
13       THE COURT: Ladies and gentlemen, we'll take a
14   ten-minute recess at this time. Don't eat too much because
15   I've arranged for lunch for you at 12:45. So remember the
16   admonitions and we'll see you in ten minutes.
17       (Recess taken.)
18       THE COURT: All of the jurors are present as is
19   Mr. Ha and Mr. Ross.
20       So, Mr. Ha, you may do your argument at this time.
21       MR. HA: Yes. Your Honor, may I ask your permission
22   to stay at this seat?
23       THE COURT: If that's your desire, you may do so.
24       MR. HA: Thank you.
25       THE COURT: Just so long as the jurors can hear you.
26       MR. HA: Yes, thanks.
27       Thank you, Deputy.
28       Thanks for coming my fellow citizens. I have heard

Exhibit 7

exh 8   p 103

Hung Has do b ARGUMENT

103

1  is sufficient for proof of any fact."

2       So that's -- these are the two statutes which will

3  prove to be crucial to my argument.
                        REMIND

4       I would like to argue my -- the jury of my narrative

5  response in the testimony that I gave in the previous two

6  days.  You need to remember my narrative.  My narrative did

7  not last for a long time, although the preceding part took

8  quite a long time.  My narrative of event took a short time

9  and I used a chart to illustrate or a diagram.  So I don't

10  believe I need to rehash the facts.  All you need is to

11  remember what I state to you.  And let me state to you, my

12  fellow citizen, the narrative is completely true and correct.

13       Okay.  Having said that, let me turn to Mr. D.A.'s

14  argument.  The D.A.'s argument spends a lot of its portion

15  on -- lots of times on what was happening on the basis of what

16  those two officers said.  They're just false and I don't think

17  it is worth my time to respond to that argument at all.

18       So all I need to do is just appeal to you, remember

19  my narrative, which last for very short time.  And let me

20  state again, it's true and correct.  Of course, plus some

21  addition which I add subsequently yesterday is true and

22  correct.

23       So that's basically my closing argument.  And I

24  would like to add some point in the remaining time, so -- I'm

25  not doing it in a coherent manner, so I would just go in a

26  confusing way and I hope you would excuse me for doing that.

27  I'm not well prepared.  A lot of evidence is unable to be

28  introduced.

Exhibit 8

exh 9   p 104

1  instructed that you can find a lesser of assault on Jason

2  Collom as a peace officer, or you can find a battery on

3  Officer Collom if you find that defendant returned violence in

4  response to excessive violence by the police officers and his

5  response was unreasonable, or you could also find as a lesser

6  of that assault.

7        I submit to you, ladies and gentlemen, this case is

8  not about the lessers. It's about the facts. It's about the

9  charges. It's about the counts as they are. If you don't

10  find the lodging, so be it. I submit to you the lodging is

11  proven beyond a reasonable doubt. If you don't find it, so be

12  it. Acquit Mr. Ha. But the violence of 148 and 243(b) based

13  on the officers trying to do their job -- a job we expect of

14  them, a job we would hold them accountable for if they didn't

15  do. If they didn't find out who this man was and went about

16  their way and then something happened, who would we be mad at?

17  We'd be mad at the officers. Apples and oranges. I have to

18  prove beyond a reasonable doubt that he lodged. I submit to

19  you I have. But if you don't think I have, I submit to you

20  the officers' contact was only shown to be reasonable based on

21  the circumstances. They had reasonable suspicion. They had

22  probable cause. Mr. Ha resisted their efforts, he delayed

23  their efforts, he obstructed their efforts, and he battered

24  Officer Collom. And I'm asking you to return a verdict of

25  guilty in each count. Thank you.

26        THE COURT: Ladies and gentlemen, we're going to

27  take the noon recess at this time. You will accompany the

28  bailiff to the appropriate restaurant. But remember the

exh 10   p 105 − 107

```
 1            THE COURT:  Would you please hand the verdicts to
 2    the bailiff?
 3            I have received four verdicts that you have signed,
 4    and one of them pertains to Count -- two of those verdicts
 5    pertain to Count 2.
 6            A JUROR:  Correct.  We --
 7            THE COURT:  And I don't know which one of the two
 8    you want to use, so I'm going to give these two verdicts back
 9    to you.
10            A JUROR:  Okay.
11            THE COURT:  And do you want to retire and determine
12    which one of the two you want to use?
13            A JUROR:  Well, we need further instructions on --
14    to distinguish which one we should use.
15            A JUROR:  Because the codes were kind of
16    conflicting.
17            A JUROR:  Or they seem kind of similar.  We know
18    which one we want to vote on.  We just couldn't tell which one
19    was the right piece of paper.
20            THE COURT:  The defendant is charged with a 243(b).
21    That's the greater offense.  If you found him guilty of that
22    particular offense, you would not have considered anything
23    else.  If you found him guilty of one of the lesser offenses,
24    then you would have to find him not guilty of the 243(b).
25            A JUROR:  Okay.  That clears things up for us.
26            THE COURT:  Do you understand that?
27            A JUROR:  Uh-huh.
28            THE COURT:  Then you have given me two verdicts as
```

106

```
1    to that count and you can only use one of them.

2                   A JUROR:  Okay.

3                   THE COURT:  So you have to determine whether you

4    want to find him guilty of the 243(b) or you want to find him

5    guilty of the lesser -- a lesser.

6                   A JUROR:  Right.

7                   THE COURT:  Do you understand that?

8                   A JUROR:  Uh-huh, yes.

9                   THE COURT:  Do you want to go out and determine that

10   or do you know?

11                  A JUROR:  We know.

12                  THE COURT:  You know?

13                  A JUROR:  Yes.

14                  THE COURT:  Then I'll have the clerk -- well, can

15   you tell me which one?

16                  A JUROR:  The 243(b).

17                  THE COURT:  243(b)?

18                  A JUROR:  Yes.

19                  THE COURT:  And I will give those verdicts --

20                  A JUROR:  That's the greater, right?

21                  THE COURT:  -- to the clerk to read.

22                  Would you read them in the appropriate order that

23   they were charged, please?

24                  THE CLERK:  Ladies and gentlemen of the jury, you

25   will listen as I read your verdicts.

26                  We, the jury, in the above-entitled cause, find the

27   defendant guilty of a misdemeanor, to wit, a violation of

28   Section 647(j) of the Penal Code of the State of California,
```

DEANNA HILL, CSR #8765

107

1   in that said defendant did then and there willfully lodge in a
2   building, structure, vehicle and place located on the second
3   floor hallway at Dwinelle Hall without the permission of the
4   owner and permission -- and person entitled to the possession
5   and in control there of the U.C. Regents.

6           We, the jury, in the above-entitled cause, find the
7   defendant guilty of a misdemeanor, to wit, a violation of
8   Section 243(b) of the Penal Code of the State of California,
9   in that said defendant did then and there willfully and
10  unlawfully use force and violence without injury upon
11  Officer Collom, a peace officer engaged in the performance of
12  his duties, and did know or reasonably should have known that
13  the said Officer Collom was a peace officer engaged in his
14  duties.

15          We, the jury, in the above-entitled cause, find the
16  defendant guilty of a misdemeanor, to wit, a violation of
17  Section 148(a) of the Penal Code of the State of California,
18  in that said defendant did willfully and unlawfully resist,
19  delay and obstruct a peace officer, Mark Rhoden and/or Jason
20  Collom, of the University of California, Berkeley Police
21  Department, in the discharge of and the attempt to discharge a
22  duty of his office.

23          Dated January 4th, '02, signed by the foreperson.
24          THE COURT:  And all three of those verdicts are
25  dated and signed by the foreman?

26          THE CLERK:  That's correct.

27          THE COURT:  All right.  Ladies and gentlemen, are
28  those your verdicts?

DEANNA HILL, CSR #8765